IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | Case No. 4:21-cr-00588 |
| | § | |
| v. | § | |
| | § | |
| ANTHONY HUTCHISON AND | § | |
| BRIAN BUSBY, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**ANTHONY HUTCHISON'S MOTION FOR JUDGMENT OF
ACQUITTAL OR NEW TRIAL UNDER RULES 29 AND 33**

David Medina
Texas Bar No. 00000088
Federal Bar No. 2609723
Juan F. Vasquez, Jr.
Texas Bar No. 24033294
Federal Bar No. 32747
Nelson Mullins
1111 Bagby Street, Suite 2100
Houston, Texas 77002
346-646-5441
david.medina@nelsonmullins.com
juan.vasquez@nelsonmullins.com

*Counsel for Defendant Anthony
Hutchison*

# **TABLE OF CONTENTS**

                                                                              **Page**

Table of Citations ............................................................................................ iii

Introduction ......................................................................................................1

Background .......................................................................................................2

Legal Standard .................................................................................................4

Argument ..........................................................................................................6

    I.    THE GOVERNMENT FAILED TO PROVE EACH ELEMENT
        OF THE BRIBERY COUNTS REQUIRING JUDGMENT
        OF ACQUITTAL, OR IN THE ALTERNATIVE A NEW TRIAL ............6

        A.  Government Exhibit 1 Did Not Meet the Evidentiary Standard
            for Admission ................................................................................6

        B.  The Government failed to prove that Hutchison's payments
            amounted to bribery, as opposed to gratuities,
            as required under § 666 ................................................................15

        C.  The failure to include a definition of "official act" in the jury
            instructions necessitates a new trial on Counts 2 through 7 ................30

        D.  The government's presentation of evidence, jury instructions,
            and verdict form constructively amended the
            Superseding Indictment ................................................................35

        E.  Hutchison is entitled to a new trial on Count 1, the § 371 conspiracy
            count, because it is predicated on the bribery conviction that should
            be reversed due to the insufficient jury instruction as to the
            definition of "Official Act." ................................................................40

II.   THE GOVERNMENT FAILED TO PROVE THE ELEMENTS
      OF WIRE FRAUD UNDER 18 U.S.C. 1343...............................42

      A.   The Government failed to prove any *interstate* wire communication .42

      B.   The government failed to prove specific intent to defraud .................53

III.  PROSECUTORIAL MISCONDUCT WARRANTS A NEW TRIAL ...62

      A.   Hutchison was prejudiced by the government's Brady violation..... 62

      B.   The Government's improper statements constitute reversible error .70

           1.   The government made improper statements................................70

           2.   The Government's improper statements affected
                Hutchison's substantial rights.......................................74

IV.   THE GOVERNMENT FAILED TO PROVE EACH ELEMENT OF
      THE TAX COUNTS, THEREBY REQUIRING JUDGMENT
      OF ACQUITTAL, OR IN THE ALTERNATIVE, A NEW TRIAL.......77

      A.   The Government failed to prove that Hutchison made false
           statements on an income tax return that are material,
           as required under 26 U.S.C. § 7206(1) ...............................77

      B.   The Government failed to prove that Hutchison willfully
           made material false statements on an income tax return,
           as required under 26 U.S.C. § 7206(1) ...............................89

V.    HUTCHISON'S TRIAL COUNSEL FAILED TO PRESENT
      EVIDENCE THAT REASONABLE COMPETENT COUNSEL
      WOULD HAVE PRESENTED RESULTING IN PREJUDICE
      TO HUTCHISON..................................................................93

      A.   Hutchison's trial counsels' performance was constitutionally
           deficient because they failed to call Larry Nabors as a witness ........94

    B.  Hutchison's trial counsels' performance was constitutionally deficient because they failed to use available evidence to cross-examine Ulysses Tejada to rebut his testimony that he did no work in exchange for a $175,000 check ................................96

    C.  Hutchison's trial counsels' performance was constitutionally deficient because they failed to object to the testimony and documentary presentation of purported information from Google regarding its email ........................................97

Conclusion ........................................................................................98

Certificate of compliance ...............................................................99

Certificate of service .....................................................................100

# TABLE OF CITATIONS

**Cases**            **Page**

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................... 62-64, 66

*Hedgpeth v. Pulido*, 555 U.S. 57 (2008)...................................................................41

*Hernandez v. United States*, 2023 WL 11967352 (S.D. Tex. Dec. 18, 2023).........68

*Jackson v. Virgina*, 443 U.S. 307 (1979)...................................................................4

*Kyles v. Whitley*, 514 U.S. 419 (1995)....................................................................62

*McDonnell v. United States*, 579 U.S. 550 (2016) ............................................. 32-35

*Neder v. United States*, 527 U.S. 1 (1999)...............................................................88

*Pierce v. Ramsey Winch Co.*, 753 F.2d 416 (5th Cir. 1985)....................................33

*Snyder v. United States*, 603 U.S. 1 (2024) ...................................... 15-16, 31-32, 36

*Spence v. Johnson*, 80 F.3d 989 (5th Cir.1996)........................................................64

*Strickland v. Washington,* 466 U.S. 668 (1984)........................................................93

*Strickler v. Greene*, 527 U.S. 263 (1999) ...........................................................64, 69

*United States v. Aguilar*, 645 F.3d 319 (5th Cir. 2011)..........................70-71, 75-76

*United States v. Arce*, 997 F.2d 1123 (5th Cir. 1993) ..................................... 7-8, 10

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998)............................................68

*United States v. Bennett*, 874 F.3d 236 (5th Cir. 2017).......................................72, 74

*United States v. Berrios-Centeno*, 250 F.3d 294 (5th Cir. 2001) ...........................37

*United States v. Bishop*, 412 U.S. 346 (1973) ....................................................90, 92

## TABLE OF CITATIONS

**Page**

*United States v. Brown*, 459 F.3d 509 (5th Cir. 2006) ..............................................53

*United States v. Brown*, 650 F.3d 581 (5th Cir. 2011) ..............................................64

*United States v. Chambers*, 408 F.3d 237 (5th Cir. 2005)........................................36

*United States v. Comstock,* 974 F.3d 551 (5th Cir. 2020) ............................... 54-55

*United States v. Crittenden*, 46 F.4th 292 (5th Cir. 2022)........................................62

*United States v. Corona*, 551 F.2d 1386 (1977)......................................................71

*United States v. Doucet*, 994 F.2d 169 (5th Cir. 1993) ............................... 36, 38-39

*United States v. Dvorin*, 817 F.3d 438 (5th Cir. 2016).....................................53, 64

*United States v. Ebron*, 683 F.3d 105, 135 (5th Cir. 2012).....................................10

*United States v. Flores*, 2025 WL 561417 (5th Cir. Feb. 20, 2025) .......................35

*United States v. Gallardo-Trapero*, 185 F.3d 307 (5th Cir. 1999)..........................74

*United States v. Gaudin*, 515 U.S. 506 (1995) ........................................................88

*United States v. Grant*, 850 F.3d 209 (5th Cir. 2017) .............................................37

*United States v. Greenlaw*, 84 F.4th 325 (5th Cir. 2023)................................70, 74

*United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022)........................... 16, 37-39

*United States v. Hankton*, 51 F.4th 578 (5th Cir. 2022) ...................................63, 66

*United States v. Hoffman*, 901 F.3d 523 (5th Cir. 2018)..................................51, 62

*United States v. Holmes*, 406 F.3d 337 (5th Cir. 2005)..............................................7

# TABLE OF CITATIONS

**Page**

*United States v. Hoover*, 467 F.3d 496 (5th Cir. 2006)..............................................38

*United States v. Jackson*, 636 F.3d 687 (5th Cir. 2011) ..................................... 7-14

*United States v. Jordan*, 958 F.3d 331 (5th Cir. 2020).............................................62

*United States ex rel. Vavra, v. Kellogg Brown & Root, Inc.*,
   848 F.3d 366 (5th Cir. 2017) ...............................................................39

*United States v. Lockhart*, 844 F.3d 501 (5th Cir. 2016)..........................................36

*United States v. McCann*, 613 F.3d 486 (5th Cir.2010) .............................. 71-72, 75

*United States v. McKinney*, 758 F.2d 1036 (5th Cir. 1985) .....................................64

*United States v. Millet*, 123 F.3d 268 (5th Cir. 1997) .............................................36

*United States v. Neal*, 27 F.3d 1035 (5th Cir. 1994) ...............................................66

*United States v. Pettigrew*, 77 F.3d 1500 (5th Cir. 1996) ............................4, 34, 41

*United States v. Pomponio*, 429 U.S. 10 1976........................................................90, 92

*United States v. Reasor*, 418 F.3d 466 (5th Cir. 2005).........................................36, 38

*United States v. Robertson*, 110 F.3d 1113 (5th Cir.1997)..................................4, 62

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007)...................................53, 66

*United States v. Simmons*, 714 F.2d 29 (5th Cir. 1983)............................................62

*United States v. Sipe*, 388 F.3d 471 (5th Cir. 2004) ...................................63, 64, 69

*United States v. Spalding*, 894 F.3d 173 (5th Cir. 2018)........................................54

# TABLE OF CITATIONS

**Page**

*United States v. Stanford*, 805 F.3d 557 (5th Cir. 2015) ........................................42

*United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999) .............................37

*United States v. Surtain*, 519 F. App'x 266 (5th Cir. 2013) ..................................74

*United States v. Swenson*, 894 F.3d 677 (5th Cir. 2018) ......................................63

*United States v. Tarango*, 396 F.3d 666 (5th Cir. 2005) .........................................5

*United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014) .............................4

*United States v. Wall*, 389 F.3d 457 (5th Cir. 2004) ...............................................4

*United States v. Walters*, 351 F.3d 159 (5th Cir. 2003)..........................................66

*United States v. Wright*, 634 F.3d 770 (5th Cir. 2011)..............................................5

*United States v. Young*, 753 F.3d 757, 774 (8th Cir. 2014).....................................10

**Statutes and rules**

18 U.S.C. § 2 ..............................................................................................*passim*

18 U.S.C. § 201(b) .....................................................................................*passim*

18 U.S.C. § 371 ..........................................................................................*passim*

18 U.S.C. § 666...........................................................................................*passim*

18 U.S.C. § 666(a)(2)..................................................................................*passim*

18 U.S.C. §1343...........................................................................................*passim*

26 U.S.C. § 7206(1) ....................................................................................*passim*

# TABLE OF CITATIONS

**Page**

R. 29, Fed. R. Crim. P. ...................................................................*passim*

R. 33, Fed. R. Crim. P. ...................................................................*passim*

R. 801(d)(2)(E), Fed. R. Evid ........................................................*passim*

R. 901, Fed. R. Evid. .....................................................................*passim*

# INTRODUCTION

"Our procedure has been always haunted

by the ghost of the innocent man convicted.

It is an unreal dream."

Judge Learned Hand, *United States v. Garsson*, 291 F. 646, 649 (S.D.N.Y. Feb. 1, 1923). While Judge Hand may have dismissed the idea of an innocent man being convicted as an unreal dream, the reality is that many citizens have been wrongfully indicted and wrongfully convicted.  One wrongful conviction is one too many.

When the totality of the facts and evidence are considered, it is reasonable to conclude that Anthony Hutchison was convicted with evidence that was insufficient, and he should be acquitted or granted a new trial.

## BACKGROUND

On April 18, 2025, after a 20-day trial, a jury convicted Defendant Anthony Hutchison on 21 counts arising out of work performed by Hutchison's businesses under various lawn mowing and maintenance contracts with the Houston Independent School District.

The indictment asserted counts for conspiracy, bribery, wire fraud, witness tampering, and filing false tax returns. Those charges arose out of conduct related to payments Hutchison made to five employees of the School District, which the prosecution claimed were made in exchange for awarding work to be performed for the School District. The claims were also based on an alleged scheme of overbilling for lawn mowing services and supplying playground safety mulch known as "Kiddie Cushion" that Hutchison provided to the district through his companies Southwest Wholesale LLC and Just Construction LLC.

The jury convicted Hutchison of paying bribes to six co-conspirators, all employees of the School District: co-defendant Brian Busby, Chief Operating Officer; Derrick Sanders, Officer of Construction Services; Alfred Hoskins, who held various managerial titles related to facilities and operations during the relevant time period; Gerron Hall, Area Manager for Maintenance (South); Luis Tovar, Area Manager for Maintenance (North); and Rhonda Skillern-Jones, Trustee on the Board of Education from 2012-2019 and President of the Board in 2015 and 2018.

The jury found that between 2017 and 2018, Hutchison paid bribes to Sanders, Busby, Hoskins, Hall, Tovar and Skillern-Jones related to the construction, repair or landscaping projects at various schools in the district and that between 2017 and 2019 Hutchison inflated Southwest Wholesale's bills to the school district by invoicing for more cuts than he would instruct his subcontractors to perform and falsely inflated the costs of the Kiddie Cushion material.

Specifically, Hutchison was found guilty of Count 1 charging him with conspiracy to commit bribery or theft by fraud concerning programs receiving federal funds, in violation of 19 U.S.C. § 371, Counts 2 through 7 charging Hutchison with bribing six co-conspirators, all employees of the school district, in violation of 18 U.S.C. §§ 666(a)(2) and 2, Counts 14-24 charging him with wire fraud in violation of 18 U.S.C. §§ 1343 and 2, Count 25 charging him with witness tampering in violation of 18 U.S.C. § 1512(b)(3), and Counts 27 and 28 charging him with willfully filing false tax returns in violation of 26 U.S.C. § 7206(1). *See* DE 42 (Superseding Indictment); DE 160 (Verdict).

## LEGAL STANDARD

Under Rule 29, a court "must enter a judgment of acquittal," if "the evidence is insufficient to sustain a conviction." The conviction can only stand if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (citing *Jackson v. Virgina*, 443 U.S. 307, 319 (1979)). While a court must review the "reasonable inferences in the light most favorable to the prosecution," the court remains empowered to consider, "whether the inferences drawn by a jury were rational, as opposed to being speculative or insupportable, and whether the evidence is sufficient to establish every element of the crime." *Id.* at 302-03 (citation omitted). In other words, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996) (citation omitted).

Rule 33 provides that a "court may vacate any judgment and grant a new trial if the interest of justice so requires." A new trial is warranted when "a miscarriage of justice" has occurred. *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004).

Unlike a motion for judgment of acquittal brought under Rule 29 where the evidence must be viewed in a light most favorable to the verdict, the standard under Rule 33 is more lenient. *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997). Under Rule 33, "the trial judge may weigh the evidence and may assess the

credibility of the witnesses during its consideration of the motion for new trial." *Id.* (citation omitted). It is within the Court's discretion to order a new trial if "there would be a miscarriage of justice or [if] the weight of evidence preponderates against the verdict." *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011).

It is appropriate to set aside a jury's guilty verdict in the interests of justice "under circumstances where the evidence brought forth at trial may tangentially support a guilty verdict, but in actuality, 'preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred.'" *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (citations omitted).

# ARGUMENT

**I.**    **THE GOVERNMENT FAILED TO PROVE EACH ELEMENT OF THE BRIBERY COUNTS REQUIRING JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE A NEW TRIAL**

### A. Government Exhibit 1 Did Not Meet the Evidentiary Standard for Admission.

The Court's admission of Government Exhibit 1 ("GEX 1")—an unauthenticated handwritten "ledger" that served as the government's chief piece of evidence—constituted reversible error. The government stated unequivocally that GEX 1 was not only its "most interesting piece of evidence in the case," but its "most important document in the case." (Ex. 2, Tr. Day 2 AM at 24:15–17).[1] The government asserted that the handwritten ledger belonged to Hutchison and stated that it was used to "track his bribe payments to various individuals over a four-month period in 2017." *Id.* at 17–20. Yet the government never authenticated the exhibit or established it was a *bribery* ledger; therefore, the statements in the ledger were inadmissible hearsay. This error concerning the government's "most important" piece of evidence tainted the entire trial and contributed to, if not caused, the jury's guilty verdict, thereby necessitating that Hutchison be acquitted or allowed a new trial.

---

[1]    Exhibit 1 is an index of all exhibits attached to the motion.

Co-conspirator statements made in furtherance of a conspiracy are generally considered not testimonial and are admitted only if the statements are authenticated. *See, e.g.*, *United States v. Jackson*, 636 F.3d 687, 694 (5th Cir. 2011); *United States v. Holmes*, 406 F.3d 337, 348 (5th Cir. 2005). Pursuant to Federal Rule of Evidence 901, the proponent of a piece of evidence must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901. The Fifth Circuit has not determined the "precise contours of trustworthiness necessary to authenticate" alleged bribery ledgers. *Jackson*, 636 F.3d at 693. Courts generally consider the following when determining whether other types of ledgers are authentic:[2]

(1) whether the ledger was found in the home of a defendant known for committing the crime alleged; and

(2) whether the government's witness testified that she:

(a) worked for the defendant who allegedly created the ledger;

(b) the ledger resembled the defendant's other ledgers *concerning the same types of transactions*; and

(c) the handwriting on the ledger was similar to the defendant's handwriting.

*Id.* (citing *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993)).

---

[2] Although the Fifth Circuit noted that the test could be used to determine if the ledger was a business record, it applied the same analysis when considering whether the ledger was a statement made in furtherance of a conspiracy under Rule 801(d)(2)(E). *See Jackson*, 636 F.3d at 693–94 ("As with business records . . .). Further, *Arce*, which *Jackson* relied on, only concerned Rule 801(d)(2)(E), not Rule 803(6). *See Arce*, 997 F.2d at 1128.

The Court conditionally admitted GEX 1. (*See* Ex. 2, Tr. Day 2 AM 75:22–76:5). Notwithstanding the Court's conditional admission, the Court never found, and the government never established, that GEX 1 was authentic—the prerequisite to its admissibility. *See Jackson*, 636 F.3d at 694.

The government asserted that GEX 1 is Hutchison's "handwritten ledger . . . [that] tracks his bribe payment to various individuals over a four-month period in 2017." (Ex. 2, Tr. Day 2 AM at 24:18–20); (Ex. 3, Tr. Day 1 PM at 160:23–25). Yet despite resting its entire case on its claim that GEX 1 is a bribery ledger, the government failed to authenticate that GEX 1 was indeed a *bribery* ledger. The government's authentication shortcomings are extensive.

*First*, the government did not establish that the ledger was found at the home of someone known to engage **in bribery**. *See Jackson*, 636 F.3d at 693 (noting that "the ledgers were found in the home of a *known drug trafficker*") (emphasis added); *Arce*, 997 F.2d at 1127 ("Police recovered the ledgers from Nunez's home . . . a *known cocaine trafficker*."). To the contrary, the evidence established that the ledger instead belonged to a *known gambler*. (Ex. 2, Tr. Day 2 AM at 56:3–10) (describing Hutchison's gambling addiction); (Ex. 4, Tr. Day 18 PM at 29:6–25) ("Unfortunately, he's a compulsive gambler. He's a compulsive gambler."). The government's own cooperating witnesses did not testify that Hutchison ever paid a "bribe."

*Second*, the government did not present any evidence, or elicit any testimony, from anyone who worked with Hutchison that supported that GEX 1 resembled other ledgers concerning the same types of transaction: *i.e.*, bribery. *See Jackson*, 636 F.3d at 693. To the contrary, Diane Jones, the only witness remotely familiar with the ledger who was Hutchison's former assistant—testified that the ledger was a *gambling ledger, not a bribery ledger*. Ex. 4, Tr. Day 18 PM at 32:15–33:7.

> Q. Okay. [Referring to GEX 1] Have you seen it?
> A. I've seen it.
> Q. Now, to be fair, do you know what anything means on there?
> A. I can't understand his writing, but -- no.  All I know is that it's a gambling sheet.

*Id.* at 33:2–7. Hutchison's assistant testified that she was working with Hutchison on his gambling debts when she saw GEX 1:

> Q. Did you, in fact, yes or no, see Mr. Hutchison with this document?
> A. Yes, ma'am.
> Q. Okay. And were you working on gambling with him at the time?
> A. Yes, ma'am.

*Id.* at 68:24–69:4.

The "type of transaction" distinction is not only critical, but fatal for the government. The Fifth Circuit requires that a witness corroborate that an alleged ledger resembles other ledgers concerning the same type of transaction. *Jackson*, 636 F.3d at 693. In *Jackson*, the Fifth Circuit repeatedly stated that the notebooks had to be authenticated as "*drug* ledgers" that documented "narcotic transactions."

9

636 F.3d at 693, 698 (emphasis added). Likewise, in *Arce*, the Fifth Circuit held that drug ledgers were properly authenticated in a drug conspiracy case where a witness who worked with the defendant—a known drug trafficker—testified that "these particular ledgers resembled *drug ledgers* that Nunez maintained." *Arce*, 997 F.2d at 1128 (emphasis added). The Fifth Circuit underscored its "type of transaction" holding three years later in *Young*, noting that in *Jackson*, the issue with the ledger was, among other things, that the "subject matter of the ledger was [] unclear." *United States v. Young*, 753 F.3d 757, 774 (8th Cir. 2014).

That the offered ledgers must concern the same type of transaction as the ledgers they supposedly resemble is rooted in Rule 801(d)(2)(E). *See Jackson*, 636 F.3d at 693–94. For a ledger to be properly authenticated under Rule 801(d)(2)(E), it must be made "in furtherance of *the* conspiracy," not "a" conspiracy. FED. R. EVID. 801(d)(2)(E) (emphasis added). This is because the statement must "advance the ultimate objects of *the* conspiracy." *United States v. Ebron*, 683 F.3d 105, 135 (5th Cir. 2012) (emphasis added). If an alleged ledger concerns a different type of transaction than the transactions at the base of the charged conspiracy, then the statements in that ledger cannot be deemed in furtherance of the conspiracy exactly. This was exactly the Fifth Circuit's concern in *Jackson*. There, the Fifth Circuit held that the record did not "reflect whether the ledger[] record[ed drug] transactions at all." *Jackson*, 636 F.3d at 693. It then explicitly stated that: "The ledger entries do

10

not include any indication of the term 'cocaine' *and thus do not facially convey that they are applicable to the conspiracy charged.*" *Id.* (emphasis added).

In this case, the testimony before the Court indicated that GEX 1 resembled Hutchison's *gambling* ledgers. (Ex. 4, Tr. Day 18 PM, at 32:15–33:7). But the Indictment did not allege a gambling conspiracy. Furthermore, there was no evidence from anyone familiar with Hutchison's records to support that GEX 1 resembled a *bribery* ledger, as *Jackson* requires. *See Jackson*, 636 F.3d at 693. Because the only testimony recognized under *Jackson* established that GEX 1 not only resembled Hutchison's gambling ledgers, but *was* Hutchison's gambling ledger, the government failed to meet the "same type of transaction test" and the Court had no evidence to "reflect whether the ledger[] record[ed bribery] transactions at all." *Id.* Thus, the government failed under *Jackson* and Rule 901 to prove that GEX 1 is what the government purports it to be: a bribery ledger made in furtherance of a bribery conspiracy.

*Third*, the government's witnesses themselves raised serious concerns about the authenticity of GEX 1. Because the government did not have a witness who worked with Hutchison to testify that GEX 1 resembled other *bribery* ledgers, the government called Special Agent Paul Kindred to attempt to save its case. But Special Agent Kindred demonstrated the very reason that the Fifth Circuit requires testimony from a witness who is familiar with, and can thereby corroborate, the

11

ledger and its subject. Special Agent Kindred testified that the government found purchase orders, invoices, and "handwritten notes" near the ledger, and that the notes were "just like some of the notes that we've reviewed." (Ex. 5 Tr. Day 3 PM at 62:12–20). But Special Agent Kindred did not describe how the notes were similar, much less testify that those handwritten notes were also "bribery ledgers." *Id.*

Even more importantly, Special Agent Kindred admitted that he could not tell what GEX 1 was when he found it; rather, he "had to look at other information to make sense of" GEX 1. (*See* Ex. 5 Tr. Day 3 PM at 98:3–13). In other words, Special Agent Kindred admitted that it was not apparent from the face of the handwritten notes that the notes were a "bribery ledger." *Id.* Special Agent Kindred had to review bank records, proposals, invoices, emails, and cell phone records to reach *his own conclusion* on what he believed GEX 1 concerned. *Id.* at 84:19–24; *see* also Ex. 6 Tr. Day 14 AM at 63:3–7 (IRS Agent Jason Webb admitting that "from the time" the government got GEX 1, the government interpreted it as a bribe ledger). He then "interpreted," or "translated," GEX 1 for the jury even though no one familiar with the document authenticated it as a bribery ledger. *Id.* at 89:17–22 (testifying what "LS" and "IRR" stood for based on his own conclusions); *id.* at 108:21–109:4 (testifying that Kindred reviewed emails, financial records, and cell phone data to try to discern what "paid LV 9/16" meant, then telling the jury his personal conclusion).

Yet even as Special Agent Kindred attempted to authenticate a document that he admitted was unclear, he conceded that there were inconsistencies in GEX 1 "that we cannot explain." Ex. 5, Tr. Day 3 PM at 166:1–2. Special Agent Kindred admitted that while he attempted to match entries in GEX 1 with payments made to Just Construction or Southwest Wholesale to reach his conclusion that GEX 1 was a bribery ledger, he could only do so *29% of the time*. *Id.* at 166:4–12. Far from authenticating GEX 1, Special Agent Kindred conceded that his chosen methodology for determining whether GEX 1 was a bribery ledger resulted in a "positive" match less than one-third of the time. *Id.* This is the very type of testimony that *Jackson* prohibits. *See Jackson*, 636 F.3d at 691–93 ("The government introduced the notebooks at trial solely through the testimony of Officer Hight, who twice stated that his analysis of them was "based on [his] experience as an officer and nothing from what was obtained from Mr. Valdez.").

Furthermore, cooperator and former HISD employee, Gerron Hall, testified that GEX 1 did not state accurate dates or monetary amounts. *See* Ex. 7, Tr. Day 4 PM at 78:5–18. Cooperator and former HISD employee, Alfred Hoskins, testified that in his first meeting with the government, the government told him that GEX 1 was a "bribery ledger," to which he responded that he did not take any bribes. Ex. 8, Tr. Day 5 AM at 32:10–33:11. He further testified that he did not receive "$5,000 at Chathum" as the government claimed under GEX 1. *Id.* at 124:11–25. And he also

13

testified that none of the times, places, or amounts in GEX 1 were accurate. *Id.* at 127:1–3. Cooperator and former HISD board member, Rhonda Rene Skillern-Jones, testified that GEX 1 did not accurately reflect payments to her, and she was not paid $20,000 in 2017, as the government claimed GEX 1 recorded. Ex. 8, Tr. Day 5 AM at 57:16–58:1; *id.* at 106:11–16. And FBI Agent Kathryn Prado testified that she could not match any cash deposits in Busby's bank accounts with the amounts recorded on GEX 1. Ex. 9, Tr. Day 19 AM at 81:9–12. This testimony underscores that the government simply failed to authenticate GEX 1.

*Finally*, the government's authentication efforts were also deficient in other ways. GEX 1 never states that it traces "bribes." *Jackson*, 636 F.3d at 693 (noting that the "ledger entries do not include any indication of the term 'cocaine'"). The government did not offer any handwriting analysis. *Id.*; Ex. 4, Tr. Day 18 PM at 11–13. And no evidence was offered to establish when GEX 1 was created, including whether it was created as a real-time record during the course of the alleged conspiracy. *Jackson*, 636 F.3d at 694 (noting that without proper testimony "the events recorded therein could have taken place at times outside the course of the relevant drug-trafficking conspiracy"). Therefore, like in *Jackson*, the government "failed to satisfy virtually all of the authentication requirements with respect to the alleged [bribery] ledgers." *Id.* Therefore, to the extent that GEX-1 was ever admitted, such admission was reversible error entitling Hutchison to acquittal or a new trial.

**B. The Government failed to prove that Hutchison's payments amounted to <u>bribery, as opposed to gratuities, as required under § 666.</u>**

In Counts 2 through 7, Hutchison was convicted of six counts of bribery under 18 U.S.C § 666(a)(2), which "makes it a crime for anyone to corruptly give, offer, or agree to give anything of value to any person, with intent to influence or reward an agent of an organization, state or local government, or any agency thereof, that receives more than $10,000 in federal assistance in any one-year period, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." (DE 153 at 17-18) (Final Jury Instr.); *see* 18 U.S.C. § 666(a)(2).

Both federal and state laws "distinguish between two kinds of payments to public officials—bribes and gratuities." *Snyder v. United States*, 603 U.S. 1, 5 (2024). In general, "[b]ribes are payments made or agreed to *before* an official act in order to influence the official with respect to that future official act." *Id.* (emphasis in original). Gratuities, on the other hand, "are typically payments made to an official *after* an official act as a token of appreciation." *Id.* (emphasis in original). A "state or local official does not violate § 666 if the official has taken the official act before any reward is agreed to, much less given." *Snyder*, 603 U.S. at 19. While "a gratuity offered and accepted after the official act may be unethical or illegal under other

15

federal, state, or local laws, the gratuity does not violate § 666." *Snyder*, 603 U.S. at 19.

Section 666 originally criminalized a state official's acceptance of a gratuity, but "after only two years, Congress reversed course," and in 1986 it amended § 666 to no longer encompass gratuities. *Snyder*, 603 U.S. at 8. While confusion persisted among the Courts of Appeals about whether gratuities were included under § 666, the Supreme Court of the United States resolved the circuit split in *Snyder*, *see supra*, in **2024**. *Id.* at 10. The Fifth Circuit Court of Appeals had already reached the correct conclusion (that gratuities are not criminal under § 666) on **August 23, 2022**, in *United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022).

However, Hutchison was indicted on § 666 charges on **December 14, 2021** (DE 1), and the superseding indictment was filed on **April 7, 2022.** (DE 42). Both indictments precede the Fifth Circuit's and the Supreme Court of the United States' clarification that § 666 criminalizes only bribes, not gratuities. Despite the clarification, the Government did not amend the indictment. Instead, as we show below, the Government indicted and prosecuted a gratuities case as if it were within the scope of the bribery statute.

The government had to prove that Hutchison corruptly gave, offered, or agreed to give anything of value to any person, with the intent to influence or reward an agent of the School District. *See* (DE 153 at 17-18). In addition, bribery "requires

16

a quid pro quo—a specific intent to give or receive something of value in exchange for an official act." (DE 153 at 19). The Government failed to prove that (1) Hutchison had the required specific intent, (2) that a payment or agreement was made between Hutchison and the school district's agent *prior* to any official act, and (3) the required "quo" in the quid pro quo, i.e. which later official act the agent was influenced to perform.

Each count indicts Hutchison for a single specific payment to six individuals, who—all but one—were the Government's cooperating witnesses. We show below why the evidence was insufficient to convict Hutchison on those counts, or at least that the evidence preponderates against the verdict, and requires a new trial.

### Count 4: $20,000 to Alfred Hoskins on November 16, 2017

There is insufficient evidence for a rational jury to find beyond a reasonable doubt that Hutchison made a quid pro quo payment to Hoskins. The evidence concerning the first time Hutchison and Hoskins met and a payment was exchanged does not establish business or transactions made on behalf of the federally funded government entity of the School District, as required by Section 666.

First, there is no evidence that Hoskins received any payment from Hutchison or that any transaction occurred directly with Hoskins that influenced the selection of Just Construction (Hutchison's business) as an annual vendor with the School District on or around August 2017. Rather, Hoskins was just told by Busby to ensure

that Just Construction received a high score in its evaluation as a potential annual vendor. (Ex. 7, Tr. Day 4 PM, 119:25-123:10). Further, Hoskins also was not on the evaluation committee that selected annual vendors. He only relayed to members on the committee that Busby wanted Just Construction to be rated highly. *Id.* Moreover, Hoskins made clear that he was not the one responsible for decisions as to what companies would receive "big-dollar jobs" from the School District like the ones awarded to Just Construction. *Id.* 129:2-135:11.

When Hoskins did receive the first payment, Hutchison stated "Thanks. Appreciate you." (Ex. 8, Tr. Day 5 AM, 36:3–5; 56:10–57:21; 132:13–15). Hoskins made clear he did not have any idea or expectation that he was going to receive a payment from Hutchison at that time. *Id.* Even when. Hutchison continued to give payments to Hoskins, there was not sufficient evidence that those payments were based on any agreement between the two to continue providing Just Construction with work, especially since Hoskins did not expect any payments, and the payments were given *after* work had been completed at various schools. Hoskins made clear that even though he had begun to receive multiple payments from Hutchison, each one was "coming as a surprise" and he "wasn't expecting none of them, neither one." *Id.* 115:17-116:12. Further, Hoskins testified clearly that he "didn't do anything for [Hutchison] to give [him] money" and when asked whether he believed the payments were gifts, Hoskins agreed stating "Yes, sir. Yes, sir." *Id.* 119:11-120:5. Further,

Hoskins testified that Hutchison would typically provide him with payments *after* a job had been completed at a particular school. Ex. 8, Tr. Day 5 AM, 60:15-61:7. When Hoskins would ask what the payment was for, Hutchison would sometimes tell him it was for work completed at a particular school but would often just continue to thank Hoskins and tell him he appreciated him. *Id.* at 68:10-17, 115:17-116:12; Ex. 7, Tr. Day 4 PM, 129:2-135:11.

Additionally, there is no direct evidence connecting payments Hoskins discussed from Hutchison to the four schools *specifically listed* in Count 4 of the Superseding Indictment (i.e., HISD McCarty Building, Fonwood Elementary School, Terrell Middle School, Chatham Elementary School). Hoskins' testimony only gave hypothetical examples of how the payment interactions took place. Despite that Count 4 of the Superseding Indictment states that each of the four bribery payments to Hoskins occurred on November 16, 2017, the record testimony does not discuss any payments being made on that date. In fact, the government's Exhibit 1, which the government heavily relied on and presumed to properly record each of Hutchison's alleged bribery payments, lists inconsistent payment dates and amounts from the Superseding Indictment. Indeed, the ledger states that the alleged bribery payment of $15,000 related to work completed at Fonwood Elementary occurred on October 25, 2017. However, neither the Superseding Indictment lists that same date, nor does Hoskins testify to receiving a payment from Hutchison on

that date. Further, there is insufficient evidence on the record to even determine when the work at Fonwood Elementary was completed, such that the payment to Hoskins related to Fonwood Elementary work constituted a bribe rather than a gratuity. Indeed, Hoskins testified that he never received the $25,000 payment related to Fonwood Elementary on October 25th, 2017. Ex. 8, Tr. Day 5 AM, 122:1-21.

Similarly, although the Superseding Indictment states that Hutchison paid a bribe to Hoskins related to work at Terrell Middle School, there is no evidence on the record indicating when such work at Terrell was completed. *Id.* at 138:15-140:26. Moreover, where the ledger clearly lists "Terrell MS" indicating Terrell Middle School, the ledger does not denote any payment being made to anyone related to that school, never mind to Hoskins. Although other entries allege payments made to Hoskins related to "Terrell," Hoskins does not corroborate receiving either the payments listed on those dates or the amounts listed. *Id.* at 138:15-140:26.

Further, as for payments supposedly paid to Hoskins related to the HISD McCarty Building, Hoskins made clear that the only work he was aware of involving Just Construction and that building was a renovation job that was not completed and occurred *before* Just Construction became an annual vendor in August 2017. Ex. 7, Tr. Day 4 PM, 118:5-25. Despite the lack of evidence as to the work completed at McCarty or the dates in which such work would have been done, the ledger

supposedly states that Hoskins received several bribery payments pertaining to projects at that building:

- Two $5,000 payments on October 24th related to work at "North Maint" and "South Maint" that were given to Hoskins *at* McCarty

- Three payments of $5,000 related to "MCC #17&22", "MCC #18" and "MCC #32", only two of which indicate payment dates of November 16th and the third having no date listed at all

- One payment of $7,500 related to "MCC #32" with no date listed

Similarly, according to the ledger, in exchange for work that Just Construction had related to Chatham, Hoskins allegedly received a $5,000 bribe on November 16th. However, Hoskins never recalled receiving a payment on that date or for that amount, nor does he recall any such payments explicitly related to work at Chatham. Ex. 8, Tr. Day 5 AM, 126:21-127:17. Without evidence either in the record testimony or admitted exhibits of a clear quid pro quo agreement between Hoskins and Hutchinson or a timeline of payments to Hoskins corresponding with clear dates in which work had been completed, the government cannot clearly establish the necessary *prior agreement* between Hutchison and Hoskins to prove that any payments received by Hoskins were bribes, as opposed to mere gratuities.

Moreover, record testimony demonstrates that although he disagreed with the FBI agent's accusations that he had taken bribes from Hutchison, he understandably

feared the FBI's questioning and chose to cooperate and admit to accepting bribes to avoid potential trouble. Despite that Hoskins told the FBI agent he "didn't do bribery," he stated that the government convinced him that the ledger was a bribery ledger evidencing numerous supposed bribe payments that Hoskins did not recall receiving and for work he did not recall occurring. Ex. 8, Tr. Day 5 AM, 33:26-34:8.

<u>Count 5: $20,000 to Hall on January 11, 2018</u>

There is insufficient evidence for a rational jury to find beyond a reasonable doubt that Hutchison made a quid pro quo payment to Gerron Hall.

First, there is insufficient evidence to support that Hall awarded Hutchison any work after receiving payment from Hutchison. Hall did not receive payments from Hutchison until *after* Just Construction's work had been completed, further underscoring that such payments were gratuities rather than bribes in exchange for guarantees of future work. Indeed, Hall noted that the first payment he ever received from Hutchison was around the Fall of 2017 after a final walk-through after Just Construction's work had been completed for the School District. Ex. 7, Tr. Day 4 PM, 27:9-30:4. Hutchison gave Hall a payment in an envelope after the walkthrough and merely told him "Thank you." *Id.* For each payment made from Hutchison to Hall thereafter, Hall was only paid "[w]henever a job was complete." *Id.* at 30:5-31:12.

Moreover, there was insufficient evidence to support any quid pro quo exchange for Gross Elementary School or The Rice School, the two schools specifically noted in Count 5 of the Superseding Indictment pertaining to Hall. Ex. 7, Tr. Day 4 PM at 59:13-62:13. In fact, Hall could not recall a single instance in which Hutchison ever "attached a school to any type of gratuity" that Hall received. *Id.* Although Hall had *hoped* to receive a gratuity from Hutchison after Just Construction completed various work projects with the School District, Hall made clear he did not know whether he would receive one. Therefore, such hope alone is not sufficient to establish that any payment or agreement occurred prior to Just Construction's work. *Id.* at 106:4-109:4.

Hall testified that, even though his role at the School District provided him with a budget to select vendors, he only approved vendor jobs or projects lower in cost than those awarded to Just Construction. Hall made clear in his testimony that he would not have approved jobs above $25,000, like those awarded to Just Construction, without receiving permission from his superior, Alfred Hoskins. *Id.* at 41:19-45:17. Hall's role in awarding contracts to vendors was also one of many steps in the School District's vendor approval process, undermining the contention that Hall himself solely awarded Hutchison with School District contracts or jobs. Ex. 4, Tr. Day 18 PM, 137:11-138:21 (Eugene Salazar, an employee of the School District, outlining the several steps involved in vendor selection to vendor payment).

23

Moreover, Hall stated that he continued to work with Just Construction not because of direct payments he received from Hutchison, but because of orders he received from his general manager, Hoskins. Ex. 7, Tr. Day 4 PM, 22:13-24:15.

Lastly, the Government's attempts to link Hutchison's ledger and payments made to Hall are riddled with inconsistencies and fail to show an agreement to exchange payment for guaranteed work with the School District. The Government heavily relies on its assumption that Hutchison's ledger, introduced as the Government's Exhibit 1, clearly denotes bribes paid to Hall, among others. Yet, the supposed bribery payments listed in the ledger are inconsistent with the ten payments Hall received from Hutchison from 2017 to 2018. *Id.* at 66:7-67:12. Indeed, according to the ledger, Hutchison allegedly provided the following bribery payments to Hall:

- $15,000 on December 12th related to Cornelius Elementary School,
- $10,000 on January 11th related to Gross Elementary School,
- $10,000 on January 11th related to the Rice School

However, Hall testified that he could not recall any instance in which he received payments from Hutchison that exceeded $9,000 at one time. *Id.* at 68:19-70:8] Moreover, Hall squarely stated that he did not receive any payment from Hutchison on January 11th, despite that the ledger supposedly accounting for two bribery payments given to him that day. *Id.* Even the government's own witness tasked with analyzing the ledger, FBI Agent Kindred, could not clearly explain the

24

blatant discrepancies between the alleged bribery ledger and the payments Hall testified to receiving. Ex. 5, Tr. Day 3 PM, 146:17-149:14. When adding up each entry of alleged bribe payments to Hall recorded in the ledger, the total equates to Hall receiving approximately $80,000 from Hutchison. However, Hall stated to both FBI Agent Liu and to the jury during his testimony that he never received more than approximately $40,000 total across the ten payments given to him by Hutchison. *Id.*; Ex. 7, Tr. Day 4 PM, 30:5-31:12.

Overall, bribery under § 666 requires proof of a *prior* agreement and corrupt quid pro quo. However, the evidence here reflects instead that Hall received only *after-the-fact* gratuities, did not know whether or when he would receive future payments from Hutchison, and did not have sole responsibility for awarding and paying Just Construction for its work with the School District. Therefore, the evidence presented at trial is insufficient to sustain a bribery conviction against Hutchison under Count 5 of the Superseding Indictment.

Count 6: $10,000 to Tovar in 2017 (date(s) not specified)

There is insufficient evidence for a rational jury to find beyond a reasonable doubt that Hutchison made a quid pro quo payment to Luis Tovar. At best, the evidence shows that Hutchison paid Tovar a lawful gratuity.

The government indicted Hutchison on one count of bribery for a payment of $10,000 to Tovar in 2017 "[r]elated to Construction, Repair, or Landscaping

Project(s) at" "Various HISD Schools." (DE 42 at 10). After Hurricane Harvey in August 2017, Hutchison was awarded projects at Fonwood, Chatham, Terrell, and Marshall Middle School. Ex. 10, Tr. Day 4 AM, 95:17-97:16. These schools are on the North side and under Tovar's management. *Id.* at 90:7-93:3. However, the record is clear that Tovar did not decide or play a role in the decision to award Just Construction with the work at Fonwood, Chatham, Terrell or Marshall Middle School, and he had no personal knowledge about how the decision to use Hutchison was made. *Id.* at 95:17-97:16, 97:17-25, 148:15-18. Indeed, despite that he was the manager of the North side, Tovar made clear that on several occasions Hutchison would already be at the school site, implying that the School District "already [had] a decision of who's going to be working at that school." *Id.* at 90:7-93:3. Specifically, for the four schools listed in Count 6, Tovar made it clear that Hoskins told him to go to those school sites because Hutchison was already there waiting for him and that Tovar had no role in deciding that Hutchison was awarded contracts at those schools. Thus, there is no evidence that in 2017 Hutchison bribed Tovar in connection with these projects. *See* DE 153 at 19 ("Bribery requires a quid pro quo— a specific intent to give or receive something of value in exchange for an official act.").

Tovar testified that he only received *one* payment from Hutchison in 2017. *Id.* at 101:20-102:4; 133:9-14. This payment was made after Hurricane Harvey near the

end of the year. *Id.* Hutchison asked Tovar to meet him at McCarty, the administration building for the School District. [Ex. 10. Day 4 AM at 102:9-21]. When Tovar arrived, he got into Hutchison's truck, they started talking and then Hutchison gave him money. (Ex. 10, Tr. Day 4 AM, 103:5-12. Tovar explained that his initial response was to push the money back to Hutchison telling him, "It was fine" and "I don't need that." *Id.* at 103:16-18, 137:20-21. Hutchison responded, "I help those that help me out," and Tovar accepted the money. Ex. 10, Tr. Day 4 AM, 103:2-__; 137:23][Ex. 10, Day 4 AM Tr., 103:25-104:1]. This is consistent with Hutchison providing Tovar a gratuity for his collaboration with the projects Hutchison had been awarded under Tovar's management. Importantly, Tovar—the only person present during this conversation other than Hutchison—did not understand this payment from Hutchison to be a bribe. He testified that there was never *any agreement*—implicit or explicit—between him and Hutchison *before or after* receiving that payment concerning Tovar conducting any official act for Hutchison:

> Q. In fact, there was never any agreement, was there,
> Mr. Tovar, between you and Mr. Hutchison either before or
> after --
> A. No.
> Q. -- you received any money?
> A. No.
> Q. There never was, was there?
> A. No.
> Q. Okay. He never asked for an agreement, did he?
> A. No.

Q. He never asked you about helping him out with a particular job in return for the money he was giving, did he?

A. No.

Q. He never suggested to you that he was giving you money for a -- because of a specific job, did he?

A. No.

Q. He never asked you for a job in the future, did he?

A. No.

Q. He never suggested to you because I'm giving you this, now I want to make sure you get me some more jobs, did he?

A. No.

Q. Now, after you took that 10,000, in any of the four meetings did you ever ask him, "Well, what's this for?"

A. No.

Q. Did he ever say anything about what it was for, other than the quote that you mentioned a while ago?

A. No.

(Ex. 10, Tr. Day 4 AM, 138:17-139:18). In fact, Tovar confirmed that the one payment he received in 2017 from Hutchison *was a gift*—not a payment in exchange for Tovar to take any official act. *Id.* at 133:9-14, 134:10-11 (Q. "Because you considered it a gift; is that right? A. Yes."). Moreover, Tovar explained that it was not his understanding that Hutchison made subsequent payments after 2017 because of any specific agreement either.[3] *Id.* at 143:22-144:1-2 (Q. "Because you never thought he was doing it for a specific job, did you? A. No. Q. And you didn't think he was doing it because of any specific agreement, did you? A. No."). It is also telling that even after Hutchison's last payment to Tovar, Tovar continued to work

---

[3] Tovar was not indicted for making bribes in connection with any payments other than the one payment in 2017. *See* DE 42 at 10.

28

with Hutchison, further evidencing the payments as after-the-fact gratuities rather than bribes for Tovar to continue awarding Hutchison with work. *Id.* at 143:2-4; 10-15.

The government's attempts on re-direct to provide some evidence of a bribe from Hutchison to Tovar were unavailing. Pointing to Hutchison's ledger (relevant portion below), the government asked Tovar about Browning Elementary School but, all Tovar testified to was that the first letter of his name was listed next to "Browning E.S," referring to Browning Elementary School (Ex. 10, Tr. Day 4 AM, 167:2-17), and that information from the purchase order and invoice related to the Browning Elementary School was consistent with the information in the ledger (e.g., cost for the purchase order and invoice for Browning Elementary School, type of work, and that the invoice was submitted to Tovar). *Id.* at 167:18-171:4.



(Ex. 11, GEX 1). At best, as shown above, all the ledger showed was that Hutchison—one of the vendors for the School District—kept track of certain project information. *See id.* Tellingly, Tovar did not testify that he agreed to or awarded Hutchison the Browning Elementary School work in exchange for any payment from Hutchison. There was never an agreement between Hutchison and Tovar that he would take an official act in exchange for Hutchison's 2017 payment as required to be a bribe under § 666.

Moreover, the government's own witness tasked with analyzing the ledger, FBI Agent Kindred, could not clearly explain the blatant discrepancies between the alleged bribery ledger and the payments Tovar testified to receiving. (Ex. 5, Tr. Day 3 PM, 126:3-132:15). The testimony made clear that if the Ledger was in fact an accurate account of Hutchison's bribes to Tovar, adding up each entry of alleged bribe payments to Tovar evidenced that Hutchison was illogically paying Tovar more than Hutchison was making from the referenced jobs. *Id.* 126:3-132:15. Agent Kindred agreed that type of arrangement would not be a "normal kickback" and that the Ledger was the only ledger of alleged bribes to Tovar that he had discovered for him to analyze. *Id.*

C. **The failure to include a definition of "official act" in the jury instructions necessitates a new trial on Counts 2 through 7.**

A new trial is warranted due to instructional errors that invited the jury to convict Hutchison on the Bribery counts based on conduct that did not meet the essential elements of § 666. As set forth above, Hutchison was convicted of six counts of bribery under 18 U.S.C §666(a)(2), which "makes it a crime for anyone to corruptly give, offer, or agree to give anything of value to any person, with intent to influence or reward an agent of an organization, state or local government, or any agency thereof … in connection with any business, transaction, or series of transactions of such organization, government, or agency…." (DE 153 at 17-18) (Final Jury Instr.); *see* 18 U.S.C §666(a)(2).

30

The Jury Instructions defined the term "intent to influence and reward," and the definition included the following explanation: "Bribery requires a quid pro quo—a specific intent to give or receive something of value in exchange for an official act." (DE 153 at 19). While the instruction included the requirement for an "official act," it did not define the term "official act," which is an essential requirement to convict under § 666. *See Snyder*, 603 U.S. at 19 ("A state or local official can violate § 666 when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act.").

Hutchison's counsel requested that the following definition of "official act" be included in the jury instructions:

> **An "official act" is a decision or action on a question, matter, cause, suit, proceeding or controversy. The question, matter, cause, suit, proceeding or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is pending or may by law be brought before a public official. To qualify as an "official act," the public official must make a decision or take an action on that question, matter, cause, suit, proceeding or controversy, as defined above, or agree to do so. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit the definition of "official act."**

(DE 130 at 12) (Hutchison's proposed jury instructions) (emphasis in original). However, the request for the instructions was denied. (Ex. 4, Tr. Day 18 PM, 188: 2-12).

31

The proposed definition is a near-verbatim quote from *McDonnell v. United States*, 579 U.S. 550 (2016). In *McDonnell*, the Supreme Court of the United States delineated what constitutes an "official act" in the context of 18 U.S.C. § 201, which is the bribery statute that concerns federal officials. The court defined an "official act" as follows:

> In sum, an "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

*McDonnell*, 579 U.S. at 574. Later, in *Snyder*, the court recognized the similarities between the two statutes and explained: "In sum, § 666 tracks § 201(b), the bribery provision for federal officials." *See Snyder*, 603 U.S. at 19. It is by comparison and analysis to §201(b) that the court reached the conclusion that a "state or local official can violate § 666 when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act," thus the official act definition in *McDonnell* is applicable in a claim under § 666 as well. *Id.*

In addition to proposing the above definition of official act, Hutchison's lawyers also argued on the record that a definition of "official act" was necessary to avoid the instruction being unconstitutionally vague and insufficient, as addressed in *McDonnell*. *See e.g.*, Ex. 12, Tr. Day 7 PM 22:16-23:10; Ex. 12, Tr. Day 7 PM 24:12-15; Ex. 4, Tr. Day 18 PM 185-186 (counsel argued: this is "a specific basis for a directed verdict on two issues, and it goes to what I think is a charge error by not including that instruction that I think I need to address to preserve some things").

It "is the inescapable duty of the trial judge to instruct the jurors, fully and correctly, on the applicable law of the case, and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their search for the truth." *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 425 n.10 (5th Cir. 1985) (citations omitted). The duty extends to a defendant's right "to have the jury instructed on the law that supports defensive theories that are raised by the evidence." *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 424–25 (5th Cir. 1985).

In order to instruct a jury on the theory of a case "(1) the instruction must be legally correct; (2) the theory must be supported by the evidence; and (3) the desired instruction must be brought to the court's attention in a timely manner." *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 425 n.10 (5th Cir. 1985). Here, each requirement was met. The proposed definition was legally correct because it nearly verbatim quoted the definition in *McDonnell*, *see supra*. The proposed instruction was

supported by the evidence as outlined *supra*, Section I.B., and it was timely brought to this Court's attention in Hutchison's proposed jury instructions (DE 130), and as argued by counsel. *See supra.*

The refusal to include a requested instruction is reversible error "if the requested instruction is substantially correct, the actual charge given the jury did not substantially cover the content of the proposed instruction, and the omission of the proposed instruction would seriously impair the defendant's ability to present a defense." *United States v. Pettigrew*, 77 F.3d 1500, 1510 (5th Cir. 1996) (citation omitted).

As addressed above, the requested instruction was substantially correct because it quoted *McDonnell*, and without it, the given instruction did not substantially cover the issue of what constitutes an official act. Hutchison's defense was seriously impaired by disallowing the definition of an official act, because the proposed instruction would have provided guidance to the jury on what does and does not constitute an official act to ensure that it did not convict Hutchison based on acts that were not unlawful.

As set forth above in Section I.B., the Government's evidence was scant on the essential elements of the charged offense, and the insufficient jury instruction was so vague that it invited the jury to convict without sufficient evidence of an actual "official act," and based on gratuity payments rather than bribery. A jury

instruction that is significantly overinclusive is not harmless error. *See McDonnell v. United States*, 579 U.S. 550, 579–80 (2016) ("Because the jury was not correctly instructed on the meaning of 'official act,' it may have convicted Governor McDonnell for conduct that is not unlawful. For that reason, we cannot conclude that the errors in the jury instructions were "harmless beyond a reasonable doubt.") (citation omitted).

Because the jury instruction was unconstitutionally vague and overinclusive, the jury was not correctly instructed on the meaning of the term "official act," and the Court "cannot conclude that the errors in the jury instructions were 'harmless beyond a reasonable doubt." *Id.* (citation omitted). Thus, Hutchison is entitled to a new trial on Counts 2 through 7.

**D. The government's presentation of evidence, jury instructions, and <u>verdict form constructively amended the Superseding Indictment.</u>**

The government constructively amended the Superseding Indictment by prosecuting Hutchison under a theory broader than that stated in the Superseding Indictment and by expanding the scope of the bribery counts in the jury instructions and verdict form. *See United States v. Flores*, 2025 WL 561417, at *16 (5th Cir. Feb. 20, 2025), *cert. denied*, No. 24-7297, 2025 WL 1787801 (5th Cir. June 30, 2025) (constructive amendments can "arise through the actions of the prosecutor (offering evidence at trial) or the actions of the court (through jury instructions)")

(citing *United States v. Millet*, 123 F.3d 268, 272 (5th Cir. 1997); *United States v. Doucet*, 994 F.2d 169, 172 (5th Cir. 1993)).

A constructive amendment of the indictment violates a defendant's constitutional rights and requires reversal per se. *Id*. at 15-16 (citing *United States v. Lockhart*, 844 F.3d 501, 514 (5th Cir. 2016) ("If we conclude that there has been a constructive amendment, we must reverse the defendant's conviction.")). A constructive amendment constitutes reversible error where, as here, "it permits the defendant to be convicted upon a factual basis that effectively modified an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that with which []he is charged." *United States v. Reasor*, 418 F.3d 466, 475 (5th Cir. 2005); *see also United States v. Chambers*, 408 F.3d 237, 241 (5th Cir. 2005).

Hutchison was indicted on six counts of bribery for six payments to co-conspirators "related to" construction, repair, or landscaping projects at schools within the School District under what amounts to the Government's gratuities theory. (DE 42 at 10). Despite the Supreme Court's holding in *Snyder* making clear that § 666 criminalizes only bribes, not gratuities, the government chose not to amend the Superseding Indictment. *See supra* I.B.

The Superseding Indictment was vague and failed to identify each alleged "official act" that Hutchison sought to influence, and which he bribed or reached an

agreement to influence the co-conspirators into taking. By failing to identify the official act, the pre-*Snyder* Superseding Indictment failed to put Hutchison on sufficient notice of his alleged offenses. *See United States v. Grant*, 850 F.3d 209, 214 (5th Cir. 2017) ("'[to] be sufficient, an indictment must allege each material element of the offense'") (quoting *United States v. Berrios-Centeno*, 250 F.3d 294, 297 (5th Cir. 2001)); *United States v. Hamilton*, 46 F.4th 389, 395 (5th Cir. 2022) (explaining § 666 bribery requires "'specific intent to give or receive something of value in exchange for an official act'") (citing *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404 (1999)). Notwithstanding, the vague conduct Hutchison was indicted for as set forth in the Superseding Indictment, the jury was invited to convict Hutchison on a different theory and on broader conduct than what was set forth therein. For example, Hutchison was indicted for making a bribe of $10,000 to Tovar in 2017 related to "Various HISD Schools." (DE 42 at 10). As discussed above, the evidence showed that Hutchison made one payment to Tovar *in 2017*, but he made additional payments to Tovar *after* the 2017 payment listed in the indictment. *See* Section I.B. *supra* at 24-29 (outlining similar patterns of eliciting vague testimony from bribery co-conspirators that was inconsistent with record evidence and the conduct alleged in the Superseding Indictment).

The jury was instructed even more broadly than the vague Superseding Indictment. In fact, the jury instructions were completely devoid of any reference to

any alleged quo (i.e., an official act) in connection with any of the payments Hutchison was indicted for, an essential element of bribery. *See Hamilton*, 46 F.4th at 393 (concluding § 666 requires a quo, which jury instructions must reflect). Absent a reference to any alleged quo, the jury was invited to convict Hutchison for a gratuity or for payments made to Tovar *after* 2017— but Hutchison was not charged with bribery for later payments. *See Doucet*, 994 F.2d at 172 (explaining constructive amendment where "the jury is permitted to convict on a basis broader than that charged in the grand jury's indictment."); *see also United States v. Hoover*, 467 F.3d 496, 502 (5th Cir. 2006) (holding constructive amendment when indictment specifically charged how defendant's statement was false but allowed jury to find falsity for any reason); *Reasor*, 418 F.3d at 474 (constructive amendment where government argues defendant charged with forging securities of different organization than charged in indictment).

Finally, the verdict form broadly stated that the jury could find Hutchison guilty for the "payment of money" to each of the co-conspirators on some specified or unspecified date. (DE 160 at 2-3) (Verdict Form). Specifically, the Verdict Form set forth the following as to Counts 2 through 7:

| Count 2 | "Alleging Bribery Concerning Programs Receiving Federal Funds, namely, payment of money to Derrick Sanders on or about October 24, 2017" |

38

| | |
|---|---|
| Count 3 | "Alleging Bribery Concerning Programs Receiving Federal Funds, namely, payment of money to Brian Busby on or about October 25, 2017" |
| Count 4 | "Alleging Bribery Concerning Programs Receiving Federal Funds, namely, payment of money to Alfred Hoskins on or about November 16, 2017" |
| Count 5 | "Alleging Bribery Concerning Programs Receiving Federal Funds, namely, payment of money to Gerron Hall on or about November 11, 2018" |
| Count 6 | "Alleging Bribery Concerning Programs Receiving Federal Funds, namely, payment of money to Luis Tovar in or around 2017" |
| Count 7 | "Alleging Bribery Concerning Programs Receiving Federal Funds, namely, payment of money to Rhonda Skillern-Jones in or around 2017" |

*Id.* Those statements are misleading to the jury because they criminalize gratuities ("payment of money"), and they ignore each of the essential elements of bribery under § 666 including a reference to *any* conduct constituting an official act for any of the payments to the co-conspirators. *See Hamilton*, 46 F.4th at 393. As set forth above, gratuities to an agent are not a violation of § 666.

The verdict form conflates what constitutes an unlawful bribe with a lawful gratuity by implying that a one-sided payment is enough to establish a bribe and invited the jury to convict Hutchison of bribery for any payment regardless of the amount, or what the payment was for, or when it occurred. *See Doucet*, 994 F.2d at 172; *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 379

(5th Cir. 2017) (contrasting gratuity statute which does not require a quid pro quo to bribery statute which does). The improper constructive amendment of the indictment requires the entry of a judgment of acquittal on the Bribery and conspiracy counts in Count 1 through 7.

**E. Hutchison is entitled to a new trial on Count 1, the § 371 conspiracy count, because it is predicated on the bribery conviction that should be reversed due to the insufficient jury instruction as to the definition <u>of "Official Act."</u>**

The Superseding Indictment (DE 42) charged Hutchison "with a multi-object conspiracy under 18 U.S.C. § 371 consisting of three objects under section 666: (1) offering bribes, (2) soliciting and receiving bribes, and (3) defrauding [the School District]." (DE 124) (Government's Memo of Law Regarding the Jury Charge); *see also* DE 42 (Superseding Indictment), ¶ 11(a)-(c).

Because the § 371 conspiracy instruction under Count 1 refers to the instruction of the substantive charge of bribery under Counts 2 through 7 for Bribery under § 666, which was unconstitutionally vague and overbroad absent the definition of "official act," Hutchison's conviction on Count 1 must also be vacated. (*See* DE 153 at 12) (Jury Instructions) ("In defining the terms used in paragraph a., above, you must refer to the specific instructions pertaining to Counts Two through Seven."). If the Court agrees that Hutchison is entitled to a new trial on Counts 2 through 7 due to the vague jury instruction, it follows that he would also be entitled

to a new trial on the conspiracy to bribery charge in Count 1, that relies on the same jury instruction.

Although Count 1 included other bases for conviction, the jury verdict does not delineate which of the three bases served as the basis for the conviction. (DE 160 at 1) (Jury Verdict). Instead, it merely stated in general terms: "**COUNT 1:** Alleging Conspiracy to Commit Theft or Bribery Concerning Programs Receiving Federal Funds." *Id.* (emphasis in original).

A conviction that is "based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (citations omitted); *see also United States v. Pettigrew*, 77 F.3d 1500, 1511–12 (5th Cir. 1996) ("where a general verdict form allows for conviction for conspiracy to commit any one of several object offenses a legal defect in any one of the offenses alleged will require reversal of the conspiracy conviction."). This error was not harmless and instead amounts to reversible error for the same reasons as set forth above relating to the substantive § 666 bribery counts. This Court should therefore order a new trial on Count 1's conspiracy conviction.

**II. THE GOVERNMENT FAILED TO PROVE THE ELEMENTS OF WIRE FRAUD UNDER 18 U.S.C. § 1343**

**A. The Government failed to prove any *interstate* wire communication.**

Hutchison was convicted of eleven counts of wire fraud under 18 U.S.C. § 1343, which "makes it a crime for anyone to use interstate wire communications in carrying out a scheme to defraud." (DE 153 at 23); *see* 18 U.S.C. §1343. The Government had to prove that Hutchison transmitted or caused to be transmitted by way of wire communications, **in interstate commerce**, any writing for the purpose of executing such scheme. (DE 153 at 23) (emphasis added). Without any wire communication crossing state lines, no *federal* wire fraud crime exists. *See United States v. Stanford*, 805 F.3d 557, 566 (5th Cir. 2015) ("The particular predicate for jurisdiction for wire fraud requires a 'communication in interstate or foreign commerce.' 18 U.S.C. § 1343."). In other words, the "statute does not apply to purely **intrastate** communication." *Id.* (emphasis added).

Here, the eleven underlying emails that serve as the Government's basis for the wire fraud charges in Counts 14 through 24 were all sent from an email address associated with Hutchison's business Southwest Wholesale, which is located in Houston, Texas. *See* DE 042 at 14-15 (Superseding Indictment). Each of the emails was sent to the Houston Independent School District. In other words, these were purely local intrastate transactions and communications. The superseding indictment

42

does not charge Hutchison with any other conduct occurring across state lines. *See id.*

The Government's only "hook" to turn these allegations into a federal offense, is that the email traveled from Hutchison in Houston to a Google server in another undisclosed state and then back to Houston to the School District. In its closing argument, the Government explained:

> I think we provided - - or we did provide evidence and had the agent testify about HISD servers being serviced by Microsoft, which were in one state, and Mr. Hutchison's Southwest Wholesale was being serviced by Google, which is in another state. So that is the interstate commerce piece, just to kind of knock out that legal point.

(Ex. 13, Tr. Day 19 PM at 11:16-21). However, the evidence did not demonstrate what the Government asserted in closing. Instead, the evidence of interstate wire communication was wholly insufficient.

The Government did not call a witness employed by Google or Microsoft to testify about how each email service-provider routes its emails. Instead, it called witnesses with no discernable experience as to those topics and without any personal knowledge.

As to Google's practices, the Government called Jason Webb, an IRS investigator who has an undergraduate degree in management information systems from 2003, and a master's degree in accounting from 2005. (Ex. 14, Tr. Day 13 AM, at 115-16).

The only testimony Mr. Webb provided was to confirm the content of a letter purportedly from Google addressed to another agent that the Government read aloud in court. (Ex. 14, Tr. Day 13 AM at 119:2-9). The unauthenticated letter was identified as Exhibit 917 on the record. *Id.* The selected portion of the letter that was read aloud stated: "Dear Special Agent Liu, after a diligent search and reasonable inquiry, we found no records that Google had gmail servers in the state of Texas for the date range June 1st, 2017, through and including July 29, 2019." (Ex. 14, Tr. Day 13 AM at 119:2-9). In conclusory fashion, Mr. Webb then testified

AUSA Johnson:
So from your experience working as a network administrator, if an email is sent from this email address admin@swat4241.com … and that email is sent from within the state of Texas, let's say in Houston, where does that email go?

Webb: It goes to a Google server, which is necessarily outside the state of Texas.

Johnson: Okay. Because Google didn't have servers in the state during this time frame?

Webb: Yes, sir.

This testimony is insufficient and problematic for many reasons.

**First,** Mr. Webb did not testify that he ever worked as a network administrator, as stated by the Government, and as addressed further below, Mr. Webb had no relevant professional experience to support his conclusory testimony, and absolutely no personal knowledge.

**Second**, none of the emails forming the basis for the wire fraud in Counts 14 through 24 were sent from the email address admin@swat4241.com that Mr. Webb testified about. (*See* DE 42, at 15-16) (Superseding indictment).

**Third,** the Government's exhibit 917 is not a letter from Google, it is instead a photograph of an office space. (*See* Ex. 15, GEX 917).

**Fourth**, GEX 917 was not admitted into evidence pursuant to the Court's Exhibit list filed April 18, 2025. (DE 152 at 33). Instead, it was crossed out on the list. *Id.*

**Fifth**, the letter from Google was not identified on any of the Government's exhibit lists filed pretrial, and neither of the Defendant's trial counsel appeared to have a copy of the letter in their records. It was only in connection with the undersigned's prefiling good faith conference communication with AUSA Heather Winter that the letter was instead identified as Government's **Exhibit 997**, not 917, and a copy was provided. (Ex. 16, GEX 997). However, while GEX 997 was included in the handwritten notes at the end of the Government's amended Exhibit list filed on the docket as the Court's exhibit list on April 18, 2025, it was not listed as offered or admitted into evidence, and consequently likely not submitted to the jury:

| 992 | Physical Exhibit - legal pad with handwritten notes | X | — | X | 3/26/25 |
|------|------|------|------|------|------|
| 994 | Physical Exhibit - triplicate receipt book payments to Bull Dog Timber | X | — | X | 3/26/25 |
| 995 | Organizational Chart created during testimony of Eugene Salazar | | | | |
| 996 | Photo of exterior of Busby home | X | — | X | 4/4/25 |
| 997 | Google Document Certification | | | | |
| 998 | 1/31/22 Wynn letter to Busby | X | — | X | 4/9/25 |
| 999 | Summary Chart | X | — | X | 4/9/25 |

(DE 152 at 37) (highlighting added).

A search of the entire 20-day trial transcript reveals no reference to GEX 997.

Mr. Webb's entire testimony was based on a mis-identified letter sent to another agent that was not properly authenticated, clearly hearsay, and not admitted into evidence. On these grounds alone, the evidence is insufficient to establish that the email traveled across state lines.

But Mr. Webb's testimony is insufficient for additional reasons. Mr. Webb indicated that during the twenty-two years that passed since he studied management information systems, he had worked in that field for only two years. (Ex. 14, Tr. Day 13AM at 116: 18-21). However, when he testified about his work experience, he stated that he briefly worked as a CPA for a local tax firm in Houston, but then after getting his master's degree in accounting in 2005, he worked as an auditor for the Department of Defense from 2005 to 2009, when he started with the IRS in criminal investigation where he is currently employed. *Id.* at 121:6-18. Mr. Webb's role as an IRS investigator focuses on tax investigation, and in this case included

subpoenaing and summarizing financial records and comparing them to tax returns as well as interviewing witnesses. *Id.* at 122:15-24.

Notably absent from Mr. Webb's professional experience is any employment with Google, Microsoft, or any other email service provider that would have served as the basis for his confident opinion about how emails were routed by those companies in 2017 through 2019, more than 15 years after he completed his undergraduate degree in information management systems. Further, Mr. Webb lacks any personal knowledge about Google's practices and is relying solely on the above referenced letter.

The letter is troublesome too. It indicates that it is a response to a "Trial Subpoena dated April 2, 2025." (Ex. 16, GEX 997). The letter itself is also dated April 2, 2025. *Id.* It indicates that Google's same day "diligent search and reasonable inquiry" did not result in any "records reflecting that Google had Gmail servers in the state of **Texas**," during the pertinent period. *Id.* (emphasis in original). The letter concludes: "Therefore, we do not have documents responsive to your request." *Id.* The letter is addressed to Special Agent Andy Liu, but Mr. Liu did not testify at trial, and no trial subpoena was admitted into evidence, so it is unclear which documents were requested. Because no qualified witnesses testified about how Google routes its emails, the Government failed to conclusively establish that the email crossed state lines. Instead, it is entirely conceivable that Google could route the email

through other local servers that may not be named "Gmail servers" within Google's records, and thus, would not return responsive documents to the Government's apparent request for a search for documents related to "Gmail servers."

Notably, the letter does not confirm that the email would have to leave the state to be sent from one address in Houston to another address in Houston. That is merely an unfounded conclusion reached by an IRS agent who is unqualified to testify about the topic. Regardless, without testimony by an employee of Google or at least a witness with personal knowledge, the letter remains inconclusive hearsay.

As to Microsoft, the School District's email service provider, the evidence is even more attenuated. Although the Government in its closing argument told the jury that the IRS agent testified to the location of the Microsoft servers, he did not.

The Government also did not call a witness employed by Microsoft, or anyone else with personal knowledge, and it did not offer any exhibits related to the location of Microsoft's servers or how Microsoft routes its emails sent or received in Texas. Instead, it asked Eugene Salazar, a 25-year veteran with the School District who has no discernable experience with Microsoft or any other email service provider. Instead, Mr. Salazar has an undergraduate degree in Finance from 1997, and he started working for the School District in 1999 as a budget analyst. (Ex. 17, Tr. Day 9 AM, 15:22-116:15). He advanced from that position to become an accounting manager for the facilities team, and then a senior manager of operations. *Id.* at 116-

117. In 2017, he became an officer of operations who reported directly to the Chief Operations Officer. *Id.* at 117:4-17. He testified that throughout these positions he managed the finances for the facilities team, and when he was promoted to the position in operations in 2017, he oversaw the finance group, and explained: "we also managed transportation, nutrition services, construction services, and at the - - initially, it was the police department also." *Id.* at 117:20-118:9.

Despite Mr. Salazar's diverse experience within the School District, he made no mention of any position related to information technology, information systems, or communication systems within the School District. He also did not testify to any employment with Google, Microsoft, or any other email service provider prior to his 25-year tenure at the School District. Instead, he testified as follows:

AUSA Johnson: And from your 25 years of experience at HISD, do you also have some familiarity with the [School District's] IT system?

Salazar: Yes, Sir.

Johnson: Do you know … who manages [the School District's] email system?

Webb: We contract that with Microsoft.

Johnson: And do you know how Microsoft houses that computer system that -- that houses the -- the email system?

Salazar: It's cloud-based. So it's generally stored in different geographical locations throughout the United States.

Johnson:     Why is it spread among different geographic locations?

Salazar:     That's just a precaution against any type of natural disaster in one area of the country. There's redundant systems that are going, backing up the system -- backing up the email system.

Johnson:     So if you send an email to [the School District], is it going through that cloud system?

Salazar:     Yes, sir.

(Ex. 17, Tr. Day 9AM 125:13-126:7). That was the extent of any testimony regarding the School District's email system, and Microsoft's practices in routing its emails. It is clear from the transcript that Mr. Salazar was called to testify to the fact that the School District receives federal funding. However, he is wholly unqualified to talk about the School District's IT services, and he has no experience or personal knowledge whatsoever in Microsoft's practices.

The Government did not call anyone from the School District's information technology department, and it did not call a witness employed by Microsoft or anyone else with personal knowledge.

The evidence of the occurrence of an interstate wire communication is so insufficient that no reasonable jury could have reached that conclusion. Indeed, the testimony is so sparse that it did not even put Hutchison's trial counsel on notice that this would be the Government's attempt to show that an interstate wire communication occurred.

Although the Fifth Circuit has permitted a conviction for wire fraud where both the sender and recipient were located in the same state; there, the Government called a witness employed by Yahoo, the defendant's email service provider, who testified to the details of how the Yahoo email would have had to travel across state lines to reach the recipient. *See United States v. Hoffman*, 901 F.3d 523, 546 (5th Cir. 2018), *as revised* (Aug. 28, 2018). Here, instead, it was an IRS agent with no qualifying experience or personal knowledge who testified to conclusions he derived from an unauthenticated letter from Google that was hearsay, mis-identified on the record, and not admitted into evidence or submitted to the jury. The only other evidence was the testimony from a School District employee working in finance with no qualifying experience or personal knowledge who opined about a cloud-based email system without any supporting documentation from Microsoft.

Considering how the interstate communication requirement is not only an essential element of a federal wire fraud claim, but also the basis for this Court's jurisdiction over those claims, the evidence is woefully insufficient and necessitates a judgment of acquittal or at least a new trial.

In addition to the foregoing, the jury instructions and the verdict form were also vague and confusing on the issue of interstate email communications.

The jury instructions merely explained the requirement for the email to travel between states as: "transmitted or caused to be transmitted by way of wire

communications, in interstate commerce, any writing for the purpose of executing such scheme…" (DE 153 at 23). The instructions defined "interstate commerce" as "commerce or travel between one state, territory, or possession of the United State and another state, territory, or possession of the United States, including the District of Columbia." (DE 153 at 24-25). The express requirement for jurisdiction—that the eleven emails had to cross state lines—was not explained sufficiently, and the problem was only exacerbated by the vague verdict form.

Each of the descriptions of wire fraud on the verdict form merely requires the jury to find "the transmission of an email" for certain date ranges. (DE 160, at 6-9, Counts 14-24). For example, Count 14 only states: "Alleging Wire Fraud, namely, the transmission of an email on or about June 7, 2017, regarding monthly maintenance invoices for June 2018," *Id.* at 6. But the government was required to prove each element of wire fraud, and the failure to include those elements in the verdict form, including that the email had to travel between states, rendered the verdict form vague and confusing.

The dearth of evidence of an essential element of wire fraud that forms the basis for this Court's jurisdiction, combined with the insufficient jury instruction, and verdict form requires the entry of a judgment of acquittal on Counts 14 through 24, or at least requires a new trial on all counts because this mistake permeated the entire trial.

**B. <u>The government failed to prove specific intent to defraud.</u>**

To sustain a conviction for wire fraud, the government also had to prove beyond a reasonable doubt that Hutchison acted with specific intent to defraud and that any alleged misrepresentation was material. (DE 153 at 23). The record demonstrates that the government failed to meet these essential elements.

A "'specific intent to defraud' means a conscious, knowing intent to deceive and cheat someone, *the proper time for identifying fraudulent intent of any statement is when the statement was made*, not when another person relies on the statement or is injured by it." (DE 153 at 23); *see also United States v. Dvorin*, 817 F.3d 438, 445 (5th Cir. 2016). Negligence, mistake, or even recklessness is not enough. Good faith is a complete defense because it is inconsistent with intent. *United States v. Rodriguez*, 553 F.3d 380, 389 (5th Cir. 2008).

Where, as here, the alleged victim retains approval authority over quantities and payments, the government's burden is especially heavy. *United States v. Brown*, 459 F.3d 509, 522 (5th Cir. 2006).

Counts 14-17 and 23-24 are predicated on email communications sent from Southwest Wholesale to the School District attaching either invoices for cuts or documents setting forth Southwest Wholesale's budgeting proposals with projected frequency schedules for grass cutting of schools for various months between August 2017 and June 2020. (Ex.18, GEX 567; Ex. 19, GEX 595; Ex. 20, GEX 607

("Budgeting Proposals"). The prosecution failed to show that Hutchison had the requisite intent to defraud the School District in connection with the mowing proposals and invoices, an essential element to wire fraud.

Cases in which the Fifth Circuit has held the evidence to be sufficient to show the specific intent element of wire fraud include evidence of the defendant taking affirmative steps to conceal a fraudulent scheme. For example, *United States v. Comstock,* 974 F.3d 551 (5th Cir. 2020) is instructive here. In *Comstock*, defendant's company had a contract with the city for janitorial services. *Id*. at 554. Before an event, the city sent a work order estimating the number of workers and hours needed; after the event, the company was supposed to invoice the city the number of hours *actually worked* but the defendant always billed for the entire estimated amount despite not working all of those hours. *Id*. Importantly, the evidence showed that the defendant instructed his manager to "try to save hours[,]" not adjust the invoices to reflect the number of hours actually worked, and to never talk about the hours to the city. *Id*. When the city asked for time sheets supporting the defendant's invoices, the defendant instructed employees to ignore timecards generated by the company's timekeeping system and to create new ones that matched the amount of work purported to have been completed on the invoices. *Id*. at 554-555. The evidence also showed that when an employee told defendant that the time sheets did not match the work done, the defendant instructed her to falsify the records. *Id*. at 555-556. *See*

*also, United States v. Spalding*, 894 F.3d 173, 181-182 (5th Cir. 2018) (finding evidence sufficient for rational jury to convict where the record showed defendant's "concerted efforts to mask the ruse expose his specific intent to defraud" including "his fake updates, his reluctance to pay for business expenses" material misrepresentations set forth in emails to investors about the company's "'cash burn' during his personal spending spree[,]'" promises not to take a salary and only use the money on business while funneling the funds to himself and testimony that the defendant "admitted his intention not to repay.").

Unlike the evidence in *Comstock* showing that the defendant took affirmative steps to conceal his fraudulent scheme, there is no evidence that Hutchison did so here. Instead, the record shows that in addition to scheduled cuts, Hutchison's subcontractors did "special cuts" when there was a special occasion at a school and that this occurred "A lot." (Ex. 21, Tr. Day 6 PM 64:2-14); Ex. 22, Tr. Day 8 PM 55:7-58-8); *see also* (Ex. 22, Tr. Day 8 PM 61:14-17 (Alexander testified that special cuts occurred "frequently")); (Ex. 4, Tr. Day 18 PM 109:24-110:13). These "special cuts" were extra cuts outside of the scheduled cuts and the grounds maintenance contract did not address how to be handled. (Ex. 22, Tr. Day 8 PM 52:12-53-14; Ex. 23, Tr. Day 12 PM 20:10-21:5) Ex. 24, Tr. Day 10 PM 6:13-24; Ex. 27, Gov't Ex. 467 (Grounds Maintenance Contract). Additionally, when Alexander asked Hutchison about a discrepancy between Southwest Wholesale's invoices and its

internal tracking sheet of *scheduled* cuts performed, Hutchison informed her that he uses the internal tracking sheet to confirm the *scheduled* cuts that occurred and to determine which other contractor to assign any remaining or missing cuts to. He told Alexander that such discrepancies would be taken care of. (Ex. 25, Tr., Day 8 AM 85:16-87:2-12). Consistent with Hutchison's statements, the evidence shows that Hutchison also had *other* subcontractors in addition to the ones assigned to specific schools for scheduled cuts who performed cuts in the School District for Hutchison. (Ex. 22, Tr. Day 8 PM 62:14-66:21).

Further, the government ignored the significance of the straight billing system, which Southwest Wholesale had been on for years with the School District. First, School District employees testified to the numerous instances in which the School District had been behind in paying its invoices to Hutchison and other vendors on School District projects. (Ex. 4, Tr. Day 18 PM 132:4-133:7). To resolve the School District's repeated delays in payments of monthly bills, the School District shifted several vendors, including Hutchison's companies, to a straight billing invoice system. (Ex. 26, Tr. Day 15 PM 32:20-34:24). The straight billing system involved taking the total value for the contract and dividing that value evenly each month in order to budget the total value across the year. (Ex. 23, Tr. Day 12 PM 7:14-8:15, 29:13-31:7). Hutchison would then send monthly bills based on the evenly divided *contract* value, rather than the actual work completed that month.

Solomon agreed that the reason for this method was "so the budget people could know that they were going to stay within their budget" and that "*at the end of the year*, if there was less cuts one month, more cuts one month, it would all balance out as long as it was within the number…that was in the contract." *Id.* Straight billing was a simpler process that provided flexibility for all parties involved given that the quantity of actual mowing cuts needed per month would fluctuate based on the season and weather. (Ex. 23, Tr. Day 12 PM 29:13-31:7). Therefore, discrepancies in the amount of mowing cuts invoiced to HISD per month compared to the amount of cuts that actually occurred were not only common, but also seemingly expected given the fluctuating mowing needs for each school and the agreement to invoice through straight billing. Consistent with this straight billing process, record testimony showed that the School District had previously informed Southwest Wholesale of discrepancies in cuts that occurred compared to cuts that were scheduled, and the School District would deduct the cost of those missed cuts accordingly. (Ex. 25, Tr. Day 8 AM 69:2-71:18).

Moreover, Hutchison actually took steps to fix billing mistakes when they were brought to his attention. Alexander testified that around July 2019, she became aware that an employee in Southwest Wholesale's account receivables had *mistakenly* billed HISD for four cuts despite Hutchison's desire for only two cuts to be billed in connection with invoices from the summer and fall of 2019. (Ex. 22, Tr.,

Day 8 PM 80:17-81:15; 83:2-17). She further testified that she was aware of a conversation Hutchison had with Nabors notifying him of the issue and awaited instruction from the School District to remedy it. (Ex. 22, Day 8 PM 79:20-85:15). In 2017, Alexander asked Hutchison about a discrepancy between Southwest Wholesale's invoices and its internal tracking sheet of *scheduled* cuts performed. Hutchison informed her that he uses the internal tracking sheet to confirm the scheduled cuts that occurred to determine who to assign any remaining or missing cuts to *other* contractors. He informed Alexander that such discrepancies would be taken care of. (Ex. 25, Tr., Day 8 AM 85:16-87:2-12). This evidence in combination with the monthly discrepancies expected by the straight billing system corroborates Hutchison's defense that his intent was to perform the cuts he proposed and invoiced for.

In sharp contrast to the affirmative actions to lie, conceal, and misrepresent key information exemplified by Fifth Circuit case law, the discrepancies between submitted proposals and invoices were not sufficient to establish that Hutchison specifically intended to defraud the School District. Indeed, when considered along with the fact that straight billing allowed for such discrepancies so long as the annual value of the contract remained consistent, the government did not put forward sufficient evidence of conduct that demonstrated Hutchison's intent to overbill the School District.

Counts 18 through 22 are all predicated on invoices for mulch services (referred to as "Kiddie Cushion"). (*See* DE 42 at 13–14). As with the purported mowing services scheme, the prosecution failed to show Hutchison acted with a conscious plan to mislead the School District in connection with the Kiddie Cushion invoices; instead, the record demonstrates open communication, reliance on School District's numbers, and good faith pricing well below School District's contract maximum.

First, the record shows that Hutchison's proposals matched the School District's own procurement spreadsheets. For example, the School District's March 2018 spreadsheet required 180 yards at Wainwright Elementary and 300 yards at Wilson Elementary, and Southwest Wholesale's April 2018 proposals reflected those exact figures (Ex. 28, Def. Ex. 16A; Ex. 29, Tr. Day 18 AM 50–55). The government emphasized October–November 2018 emails showing reduced delivery amounts (Exs. 30-33, Gov't Exs. 666–669; Ex. 29, Tr. Day 18 AM 87–93). Yet, Alexander testified that the School District "often" changed requirements mid-project and Hutchison adjusted accordingly (*id*. at 68). Far from evidence of deception, the reductions were openly communicated to Bailey Bark and reflected the School District's evolving directives.

Equally important, Hutchison consistently priced Kiddie Cushion well below the School District's authorized contract maximum. Alexander confirmed that

Hutchison billed $30 per yard—far less than the $48.50 per yard permitted under the School District's 2013 contract. (*See* Ex. 29, Tr. Day 18 AM at 61–62; Ex. 34, Def. Ex. 79). A person intent on defrauding the School District would not voluntarily charge less than the contract allowed.

This evidence demonstrates project administration and adjustments driven by the School District, not fraud. Because the government failed to link Hutchison's conduct to a knowing purpose to deceive, the Kiddie Cushion theory cannot sustain a finding of intent.

Mark McClure testified that Southwest Wholesale maintained a silo containing 9,000–10,000 yards of Kiddie Cushion at its Almeda-Genoa site and that he delivered mulch from this reserve to 30–40 schools (Ex. 35, Tr. Day 17 PM 71:3-4, 69:19-23). He further confirmed that excess mulch from one school was redistributed to others in need. (*Id.* at 32:1-3). This large reserve and redistribution practice undermine any claim of systemic under-delivery.

Tracey Alexander testified that the School District procurement provided the yardage requirements through spreadsheets and that Hutchison's proposals mirrored those figures (Ex. 28, Def. Ex. 16A; Ex. 29, Tr. Day 18 AM 50–55). She also confirmed that the School District, not Hutchison, entered the project numbers on purchase orders and that School District approval was mandatory before invoices were paid (*Id.* at 75–76).

The government's reliance on October–November 2018 emails was misplaced. Alexander explained that the School District often changed requirements mid-project and Hutchison simply adjusted (Ex. 29, Tr. Day 18 AM at 68). The adjustments were openly communicated to Bailey Bark and reflected the School District's evolving needs, not deception.

Finally, Alexander confirmed that Hutchison billed $30 per yard for Kiddie Cushion, which was substantially below the $48.50 per yard permitted under the School District's earlier contract, and that when the School District overpaid, Hutchison refunded or credited the district (Ex. 29, Tr. Day 18 AM at 27–35, 61–62; Ex. 36, Def. Exs. 33-2, Ex. 34, 79). These actions are fundamentally inconsistent with an intent to defraud.

Taken as a whole, the record demonstrates good faith, transparency, and the School District's oversight at every stage. Hutchison acted consistently with the contract's requirements, used the School District's own numbers, refunded overpayments, and maintained reserves to meet the School District's needs. That is not fraud.

## III. PROSECUTORIAL MISCONDUCT WARRANTS A NEW TRIAL.

### A. <u>Hutchison was prejudiced by the government's *Brady* violation.</u>

A "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "District judges have considerable discretion with respect to Rule 33 motions." *United States v. Jordan*, 958 F.3d 331, 338 (5th Cir. 2020) (quoting *United States v. Simmons*, 714 F.2d 29, 31 (5th Cir. 1983)). Courts generally exercise this authority under Rule 33 when the court determines that the evidence weighs "heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand," *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997), or when "procedural problems with the trial . . . [have] caused a miscarriage of justice." *United States v. Hoffman*, 901 F.3d 523, 552 (5th Cir. 2018). Examples include "the erroneous admission or exclusion of evidence, inflammatory comments by a lawyer, or faulty jury instructions." *United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022) (en banc).

Hutchison is entitled to a new trial because the government erroneously excluded evidence by failing to disclose that one of its key witnesses—Larry Nabors—materially changed his story before the close of evidence, prejudicing Hutchison and violating his due process rights. The government has an affirmative duty to disclose any exculpatory or impeachment evidence material to Hutchison's guilt or punishment. *See e.g., Kyles v. Whitley*, 514 U.S. 419, 432-434 (1995)

(discussing the lengthy precedent underscoring the prosecution's affirmative duty to disclose and noting that a *Brady* claim may occur where "the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way"). The Court also ordered the government "to comply with the prosecutor's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny" and put the government on notice "of the potential consequences of violating this Order and the disclosure obligations. The consequences include, but are not limited to, sanctions such as delaying trial or other proceedings, excluding evidence, giving adverse jury instructions, granting a new trial, dismissing the case, or finding the Government in contempt." (DE 9) (*Brady* Order).

The government failed to comply with these obligations until it was too late for Hutchison's counsel to use evidence favorable to him effectively at trial violating his due process rights. *See United States v. Hankton*, 51 F.4th 578, 602–03 (5th Cir. 2022) (the government "violates a defendant's due process rights if it withholds evidence that is favorable to the accused and material to the defendant's guilt or punishment.") (quoting *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018)); *see also United States v. Sipe*, 388 F.3d 471, 480 (5th Cir. 2004) (affirming district court's order granting new trial based on *Brady* violations).

In order to "establish a *Brady* violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or

impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016). Evidence is suppressed if the government fails to disclose it, or if the evidence was disclosed too late to make effective use of it at trial. *See United States v. McKinney*, 758 F.2d 1036, 1051 (5th Cir. 1985). "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Dvorin*, 817 F.3d 438, 451 (5th Cir. 2016) (quoting *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011) (citation omitted)). A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Spence v. Johnson*, 80 F.3d 989, 994 (5th Cir.1996)). The question is "whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

The government's failure to disclose that Nabors "changed his story dramatically" right before he was to testify under oath, constitutes a *Brady* violation. (Ex. 13, Tr., Day 19 PM 145:21-23). Nabors was the grounds manager for the School District. He was responsible for managing the landscaping of the schools including his internal staff and external landscaping vendors. (Ex. 23, Tr., Day 12 PM 13:17-23). He managed the number of cuts at the schools and had full authority to request

landscaping that was not on the schedule. (Ex. 37, Tr., Day 16 AM 55:19-20; Ex. Ex. 4, Tr. Day 18 PM, 141:13-142:4). The government made clear to the jury that Nabors was one of its key witnesses against Hutchison. During opening statements—the first time the jury heard a detailed overview of what was expected to be proven at trial—the government emphasized the importance of Nabors' testimony and even included a preview of his original statements to law enforcement. The government argued to the jury that Hutchison was a liar, implying that days after the execution of the search warrant, Hutchison concocted a "story" that he had discovered an issue with Southwest Wholesale's invoices to the school district to cover up his alleged crime. Ex. 2, Tr. Day 2 AM 35:1, 34:13-19 (the government emphasized, "Five days after the search, [Hutchison] has a meeting with [the school district], and there were some follow-up correspondence. And the communication was basically, Oh, my God, we've made this amazing discovery in the office. We've been mistakenly overbilling HISD. And so he says he wants to pay it back, and so he writes a check to HISD for $850,000, which covers the overbilling for just the 2019 year."). The government implied that Hutchison falsely referenced a fabricated conversation with Nabors four months earlier. The government argued that Nabors "will come in and testify and say he doesn't remember a conversation like that, no one told him, and he would remember if someone told him that there

65

was an 850,000-dollar billing error. He'll say he never heard that one." *Id.* at 34:20-35:5.

The government subsequently learned that Nabors "changed his story dramatically," but the government chose not to notify the defense about this significant change until *after* the close of evidence, jury charge, and closing statements. Ex. 13, Tr. Day 19 PM, 145:21-23); *see United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (*Brady* applies not only to documents but also information). Hutchison was prejudiced by this untimely disclosure because he was unable to effectively use this information at trial.[4] *See United States v. Hankton*, 51 F.4th 578, 603 (5th Cir. 2022) (finding that the untimely disclosure of information to defendant did not prejudice him only because defendant had already received the information from the government "within a day" of when the government learned of it) (citation omitted); *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003) (a defendant is not prejudiced if the evidence is received in time for its effective use at trial); *United States v. Neal*, 27 F.3d 1035, 1050 (5th Cir. 1994) (evidence disclosed before the witness testified effectively used during cross-examination not prejudicial).

---

[4] The government finished its case in chief and rested on April 10, 2025. *See* Ex. 38, Day 14 PM Tr. 49:1. Defendants presented their defense, and both rested on April 16, 2025. *See* Ex. 4, Day 18 PM Tr. 85:4 (Hutchison rested); 87:5 (Busby rested). After presenting rebuttal evidence, the government rested on April 17, 2025. *See* Ex. 9, Day 19 AM Tr. 94:1. Thus, the government had ample opportunity to notify the defense about Nabors' statements during the pendency of the trial for Hutchison to adequately assess his trial strategy and use such information effectively at trial.

Hutchison was convicted of eleven counts of wire fraud under 18 U.S.C. § 1343, which "makes it a crime for anyone to use interstate wire communications in carrying out a scheme to defraud." (DE 153 at 23) (Final Jury Instr.); *see* 18 U.S.C §1343. The counts largely involved Hutchison's alleged overbilling of mowing services provided by his company, Southwest Wholesale, to the school district. To find Hutchison "guilty of any of the counts alleging this crime," the jury had to "be convinced" that the government proved *each* of the four elements of wire fraud beyond a reasonable doubt. *Id*. (emphasis added). The first element requires a finding beyond a reasonable doubt that Hutchison "*knowingly* devised or *intended* to devise any *scheme to defraud*; that is, he submitted fraudulent proposals or false invoices to [the school district] for providing mowing services or mulch in order to overbill [the school district] for these materials and services." *Id*. (emphasis added). The fourth element requires the jury to find that Hutchison "acted with a *specific intent* to defraud." *Id*. (emphasis added). "A 'specific intent to defraud' *means a conscious, knowing intent to deceive and cheat someone*. The proper time for identifying fraudulent intent of any statement is *when the statement was made*, not when another person relies on the statement or is injured by it." *Id*. (emphasis added). "A representation is 'false' if it is known to be untrue or is made with reckless indifference as to its truth or falsity." (DE 153 at 24) (Final Jury Instr.).

The government stated that despite originally denying a conversation with Hutchison where Hutchison notified Nabors of Southwest Wholesale's inadvertent billing error to the school district in 2019, just before getting on the stand, Nabors said such a conversation may have occurred. Ex. 13, Tr. Day 19 PM 147:25-148:5. Thus, had Nabors testified, he would have corroborated Hutchison's defense concerning Southwest Wholesale's overbilling. Specifically, that an employee of Southwest Wholesale *inadvertently* overbilled the school district on invoices in 2019, which Hutchison notified Nabors about *months before* the execution of the search warrant. This testimony tends to show that, contrary to the government's theory, Hutchison did not intentionally defraud the district but upon discovery of a mistake, affirmatively took steps to remedy the error. This is the very conduct Hutchison was convicted of wire fraud for and thus, is exculpatory evidence that "goes to the heart of the defendant's guilt or innocence." *Hernandez v. United States*, No. 7:17-CR-1352-1, 2023 WL 11967352, at *30 (S.D. Tex. Dec. 18, 2023), *report and recommendation adopted*, No. 7:17-CR-1352-1, 2024 WL 4630650 (S.D. Tex. Feb. 7, 2024), *certificate of appealability denied*, No. 24-40145, 2024 WL 4601319 (5th Cir. Aug. 7, 2024), *cert. denied*, 145 S. Ct. 602, 220 L. Ed. 2d 236 (2024), *reh'g denied*, 145 S. Ct. 1225, 221 L. Ed. 2d 289 (2025) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)).

Even if Nabors testified consistent with his initial statement to the government that no such conversation with Hutchison occurred, had the defense known about the material change in his statement, it could have impeached Nabors, undermining his credibility and the veracity of his earlier statement in front of the jury.[5] No one besides Nabors and Hutchison participated in this conversation and the government had already made statements about Nabors in its opening statement that Hutchison could not refute or impeach without Nabors' testimony. Southwest Wholesale's inadvertent billing error in its 2019 invoices is not largely corroborated by other evidence at trial. Therefore, impeachment of Nabors on this issue "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Sipe*, 388 F.3d 471, 480 (5th Cir. 2004) (quoting *Strickler v. Greene*, 527 U.S. at 290, 119 S.Ct. 1936 (citation omitted)). Thus, because this evidence is not merely cumulative, and goes to the heart of Hutchison's defense, the Court should order a new trial.

---

[5] This is true even if Nabors chose to assert his Fifth Amendment privilege as to certain specific questions in connection to his prior statement to law enforcement that this conversation with Hutchison about the inadvertent billing mistake did not occur, defense counsel could use that to undermine his credibility as to those statements seeding doubt as to the government's opening statement.

**B. The government's improper statements constitute reversible error.**

**1. The government made improper statements.**

The government's improper statements including vouching for its cooperating witnesses, shifting the burden to the defendant, and misstating the law constitute reversible error. A verdict must be set aside where a prosecutor makes an improper remark, such as an incorrect statement of the law, or engages in improper questioning that affects "the substantial rights of the defendant." *United States v. Greenlaw*, 84 F.4th 325, 359 (5th Cir. 2023). Here, the government made multiple inaccurate and improper statements affecting Hutchison's substantial rights "cast[ing] serious doubt on the correctness of the jury's verdict" and the verdict must be set aside. *United States v. Aguilar*, 645 F.3d 319, 325 (5th Cir. 2011).

First, the government improperly vouched for each of the co-conspirators—all of whom are cooperating witnesses. The government told the jury that all the co-conspirators were represented by "good lawyers," each "plead guilty already to being participants in this [bribery] scheme" after "a careful process" at the end of which, the "judge finds them guilty." Ex. 13, Tr. Day 19 PM 136:13-137:3. Crossing the line further, the government said, "And I can tell you, and you should realize from the application of your own common sense, that no one volunteers to go to federal prison…people do not plead guilty on a whim. They don't plead guilty because they think it's somehow going to benefit them, People plead guilty because

70

they truly believe they did something wrong, and they are guilty." Ex. 13, Tr. Day 19 PM 136. Additionally, the government repeatedly stated that the co-conspirators had "agreed to go to prison" or were "going to prison" all because of Hutchison— not because of their own conduct. *Id.* at 141:22-142:4 (Closing Statements); *see also* Ex. 13, Tr. Day 19 PM, 22:17-24 ("the five co-conspirators, the five cooperators, the five witnesses that testified here before you,…*who are now convicted felons because of the conduct of these two defendants*.") (emphasis added).

These statements were inaccurate and not mere references to facts adduced at trial. *See also United States v. McCann*, 613 F.3d 486, 495–96 (5th Cir.2010) (statement that simply referred to facts testified to during trial was not error). Instead of letting the evidence speak for itself, the government's statements improperly asserted the prosecutor's personal opinion about the credibility of the co-conspirators. Further, the government used such statements to make an improper emotional appeal to bolster the credibility of the co-conspirators by implying that they would not lie simply because they plead guilty and agreed to go to prison because of Hutchison. *See U.S. v. Corona*, 551 F.2d 1386, 1390 (1977) (holding prosecutors comments urging guilt by association improper and noting "arguments calculated to inflame the passions or prejudices of the jury" are improper); *cf. United States v. Aguilar*, 645 F.3d 319, 325 (5th Cir. 2011) (prosecutor's statements were

an emotional appeal to credit officer's testimony that went beyond the evidence and constituted improper vouching of witness).

Additionally, the government improperly shifted the burden to Hutchison to call witnesses to disprove the government's case. Specifically, the government told the jury, "The other point I would make is you saw from the witness list that was put up on the screen. The defense obviously has the ability to call witnesses too. They've called a lot of witnesses in this case. They're free to call who they want." Ex. 13, Tr. Day 19 PM 136:8-12). Although this remark was made in response to defense counsel noting that Nabors was not called to testify, (Ex. 13, Tr. Day 19 PM 93:25-94:15), such a comment by defense counsel was proper because of the government's remarks concerning Nabors' testimony during opening statements which was never supported on the record. *See supra*, Section III.A.

Notably, defense counsel's statements about Nabors appropriately stated the fact that despite the government's promises in opening statements, Nabors had not testified and that because the government bears the burden of proof, Hutchison was under no obligation to call any witness. To the contrary, the government's rebuttal remarks misstated the law and improperly alluded to the fact that Nabors would have perjured himself—evidence not adduced at trial. *See United States v. Bennett*, 874 F.3d 236, 251, 248-49 (5th Cir. 2017) (holding that prosecutor's remarks shifting the burden to defendants were improper); *see also United States v. McCann*, 613 F.3d

486, 495 (5th Cir. 2010) (holding that remarks that may reasonably "lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt" are improper)).

Lastly, the Government's remarks during closing statements misled the jury to believe that evidence of a payment—regardless of any quid pro quo—constituted a bribe. For example, the Government stated that the financial records presented demonstrated that "five people who accepted bribes, who are referenced in this ledger, tell you exactly what they got and when they got it and how they got it in 2017, it's not so hard to figure out." (Ex. 13, Tr., Day 19 PM 29:24-30:4). The Government went on to emphasize that "[e]ach individual item in this ledger constitutes a contract and a job that was performed by Hutchison's companies. And to the penny." (*Id*. at 30:20-22). Financial records showing a payment was made and an unauthenticated document that should not have been admitted into evidence setting forth information for projects Hutchison worked on for the School District do not prove that Hutchison paid *bribes*. Despite the testimony by co-conspirators about the amounts of payments received being inconsistent with the amounts and other information set forth in the Ledger and testimony that there was no agreement with Hutchison for any quid pro quo, the government nevertheless asserted, "*what they do agree to is that they got bribes*. And the inconsistencies with respect to location or amounts, there's just as many consistencies. Hoskins told you he's

73

received bribe payments in the amount of 2,500 or 5,000 or 10,000." (*Id*. at 43:12-21) (emphasis added).

These statements ignore the co-conspirators' testimony that Hutchison's payments were a gift, not a bribe, and further suggest that the jury only need rely on the plea agreements and the fact that the co-conspirators plead guilty to Hutchison. The impact of the government's improper statements was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial" constituting reversible error. *United States v. Greenlaw*, 84 F.4th 325, 359 (5th Cir. 2023) (citation omitted).

### 2. The Government's improper statements affected Hutchison's substantial rights.

Individually, the government's remarks are sufficient to constitute reversible error. However, in the context of the trial as a whole, it is clear that the cumulative effect of the government's statements affected Hutchison's substantial rights. *See United States v. Bennett*, 874 F.3d 236, 254 (5th Cir. 2017) (courts "look[ ] at the prosecutor's remarks in the context of the trial in which they were made and attempt[ ] to elucidate their intended effect'") (quoting *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999)); *United States v. Surtain*, 519 F. App'x 266, 289 (5th Cir. 2013) ("[t]here may be instances where improper statements, which are not individually prejudicial enough to require reversal, could cumulate to affect the

defendant's substantial rights." (citation omitted)). To determine if the remarks affected the defendant's rights, the court looks to "the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the inculpatory evidence other than the improperly bolstered testimony." *United States v. Aguilar*, 645 F.3d 319, 327 (5th Cir. 2011) (quoting *United States v. McCann*, 613 F.3d 486, 495–96 (5th Cir.2010)).

The magnitude of prejudice based on the government's improper statements here is high. The government relied on the testimony of the co-conspirators and the fact that they plead guilty to prove its case repeatedly emphasizing the critical importance of the co-conspirators, referring to them as the "heart", "cornerstone" and "central fact" in this case. Ex. 13, Tr. Day 19 PM Tr. 141:22, 137:4, 136:13-14. *See United States v. Aguilar*, 645 F.3d 319, 325 (5th Cir. 2011) (where the witnesses testimony and credibility is critical, "the prejudice is high on the magnitude scale.").

The court did not give a cautionary instruction addressing the government's improper vouching of the co-conspirators or mischaracterization of the evidence and law and these highly prejudicial remarks by the government were not corrected before the jury reached its verdict. Additionally, although the court gave a cautionary instruction as to the government's statement improperly shifting the burden to the defendant, it was not immediately provided. Instead, the court gave the cautionary instruction the following day allowing jurors to consider it that night during the

imperative time immediately following the closing arguments without understanding that doing so was improper diminishing the effectiveness of any such instruction. *See* Ex. 39, Tr. Day 20 AM 3:9-4:6.

Lastly, as discussed above, the other inculpatory evidence against Hutchison was weak. The issue in this case is not whether Hutchison paid the co-conspirators, it is whether or not Hutchison *bribed* them. Despite pleading guilty (which the government improperly vouched as evidence that Hutchison was guilty), the co-conspirators testified not only inconsistently with the facts in their plea agreements and the Superseding Indictment but testified that the payments form Hutchison were gifts. *See supra* Section I.B. (outlining similar patterns of eliciting vague testimony from bribery co-conspirators that was inconsistent with record evidence and the conduct alleged in the Superseding Indictment). The government also relied on the ledger in Hutchison's day planner to prove its case. Despite the government's presumptions that the ledger was a bribery ledger, no one testified as to what the purpose of this ledger was or what exactly it kept track of. In fact, none of the witnesses could explain how the ledger worked and testified that the amounts listed in the ledger were inconsistent with the amounts of the gifts Hutchison paid them. *See e.g., supra* Section I.B. Instead, when asked about the ledger, witnesses merely corroborated information about certain projects Hutchison—a vendor for the School District—worked on. *United States v. Aguilar*, 645 F.3d 319, 326 (5th Cir. 2011)

("where there is little or no evidence against the defendant apart from the improperly bolstered testimony and where a credibility determination is of crucial importance, this court has reversed and remanded for a new trial.") (citing cases).

## IV. THE GOVERNMENT FAILED TO PROVE EACH ELEMENT OF THE TAX COUNTS, THEREBY REQUIRING JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE, A NEW TRIAL

The jury convicted Hutchison on two counts of willfully filing false tax returns, namely, Southwest Wholesale's Forms 1120 for calendar years 2017 and 2018 in violation of 26 U.S.C. § 7206(1). (DE 160, p. 10. (Verdict)).

Under 26 U.S.C. § 7206(1), a person who "[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter" is guilty of a felony.

### A. The Government failed to prove that Hutchison made false statements on an income tax return that are material, as required under 26 U.S.C. § 7206(1).

The Government did not present sufficient evidence from which a reasonable juror could conclude beyond a reasonable doubt that Hutchison: (i) made a false statement that was material or (ii) willfully made and subscribed to a false return in violation of 26 U.S.C. §7206(1).

The Alleged False Items are Not Material

The Final Jury Instructions state that "a statement or omission is "material" if it has a natural tendency to influence, or is capable of influencing, a decision or action of the Internal Revenue Service." (DE 153, p. 29 (Final Jury Instructions)).

In Counts 27 and 28, the Government alleged that Hutchison willfully and falsely overstated cost of goods sold on the 2017 and 2018 Forms 1120, and such alleged false statements were material. (Ex. 2, Tr. Day 2 AM 17:13:20).

Special Agent's Analysis of Records

Jason Webb, a Special Agent in the IRS Criminal Investigation Division, analyzed the 2017 and 2018 Forms 1120 for Southwest Wholesale. (Ex. 14, Tr. Day 13 AM 115:17-21; Ex. 40, Tr. Day 13 PM 102:10-15). He testified that there were no IRS people involved in the investigation prior to his participation in 2019, and his role was to "provide input about potential tax issues." (Ex. 6, Tr. Day 14 AM 53:14-16, 53:2-3). Special Agent Webb reviewed documents in this case, but he has no firsthand knowledge of the documents retrieved from Hutchison because he was not involved in executing the search warrant at Hutchison's offices or home. (Ex. 6, Tr. Day 14 AM 53:25; 54:1-4).

For 2017 and 2018, Special Agent Webb prepared schedules, identifying two categories of payments he alleged were falsely deducted as cost of goods sold on Southwest Wholesale's Forms 1120: (i) payments to Bulldog Timber and (ii) payments to Ulysses Tejada. He concluded that the Bulldog Timber payments

represented checks cashed by its owner Ted Theilen, with the money later being used to pay for Hutchison's gambling expenses. (Ex. 40, Tr. Day 13 PM 109:2-7). Based solely on Tejada's dubious testimony, Special Agent Webb determined that certain payments to Tejada were also material items that were falsely reported as cost of goods sold. (Ex. 40, Tr. Day 13 PM 131:7-10).

For 2017, the Government's schedule of alleged false material items included one check to Bulldog Timber for $14,000 and sixteen checks to Tejada and/or Tejada Landscaping for a total of $655,210.00. For 2018, the Government's schedule of alleged false material items included six checks to Bulldog Timber totaling $604,350.00 and twelve checks to Tejada for a total of $925,316.00.

The charts below show the taxable income reported on the Forms 1120, the "corrected" taxable income calculated by the Government after removing the Bulldog Timber and Tejada payments from cost of goods sold and the alleged additional tax owed. (Ex. 41) (GEX 700).

| Taxable Income 2017 Return | "Corrected" Taxable Income | Alleged Deficiency |
| --- | --- | --- |
| $705,917.00 | $1,375,127.00 | $227,531.18 |

| Taxable Income 2018 Return | "Corrected" Taxable Income | Alleged Deficiency |
| --- | --- | --- |
| $2,989,596.00 | $4,519,262.00 | $321,230.02 |

*Id.*; (Ex. 40, Tr. Day 13 PM 120:7; 129:20-24). Special Agent Webb testified that he considered the difference between the reported and alleged corrected tax [i.e., the alleged deficiency in the charts] to be a "material difference." (Ex. 40, Tr. Day 13 PM 120:8-12).

Special Agent Webb acknowledged seeing checks between Southwest Wholesale and Just Construction, but he did not confirm or know whether these checks constituted income or loan repayments. (Ex. 6, Tr. Day 14 AM 74:1-4); 73:23-25). He was also "vaguely familiar" with "a close to a $1,000,000 withdrawal" Hutchison made in 2018, but he did not review any further because the scope of his effort was related to the Bulldog Timber and Tejada checks. (Ex. 6, Tr. Day 14 AM, 74:14-20; 74:7-9).

The Government did not conduct a routine audit in this case. (Ex. 6, Tr. Day 14 AM, 81:18-20). Instead, Special Agent Webb relied on Hutchison's tax preparer's records, general ledger and reconciliation to calculate the alleged additional tax due on Southwest Wholesale's 2017 and 2018 Forms 1120. (Ex. 6, Tr. Day 14 AM 75:25; 76:1-2). Special Agent Webb admitted that if the tax preparers made mistakes on the returns, his figures could change, including a reduction in taxable income. (Ex. 6, Tr. Day 14 AM 85:20-24, 86:14-18).

Special Agent Webb stated that if the tax preparers treated a withdrawal to buy a piece of property by Southwest Wholesale as income "that would be

overstating income" and "[t]he payback of a loan should not be treated as income." (Ex. 6, Tr. Day 14 AM 96:4-8, 95:5-16).

Exhibit 93 shows a deposit of $334,000 into Southwest Wholesale's account on March 29, 2018. There is also a check for $334,000 from Just Construction to Southwest Wholesale, the memo line of which says, "loan payoff." (Ex. 6, Tr. Day 14 AM 98:1-14). Special Agent Webb was asked the following:

> Q: So if, in fact, the 334 is something that shouldn't have been income, and the 949-plus is something that shouldn't be income, that would mean that—that Southwest was charged as having income in excess of a million—to the tune of $1,283,266.31…Both of those, would you agree, would be errors of the tax preparers, right:
>
> A. Given what you're presenting, yes, sir.

(Ex. 6, Tr. Day 14 AM 103:17-24).

The Government did not perform any type of analysis to verify the correct income or expenses on the returns. The Government's own Special Agent admitted that the tax preparers may have mistakenly overstated the income on the 2018 return and if true, taxable income would have been much less on the return. Because taxable income is the starting point in the Special Agent's calculation of corrected tax, a huge change in income would substantially change the computation of corrected taxable income and corrected tax. If the Special Agent revised the figures to account for an overstatement of income exceeding $1,000,000, his conclusion naturally

81

would correspondingly change on whether additional tax (if any) would be material, as it would reduce the amount of the alleged deficiency to zero.

<u>Payments to Tejada and/or his Companies Were Legitimate Business Expenses</u>

At trial, Tejada testified that he worked as a supervisor for Southwest Wholesale during 2015 and later started his own landscaping company called U.S. Southern Lawns. (Ex. 21, Tr. Day 6 PM 41:8-12, 51:22-25; 52:1). U.S. Southern Lawns provided lawn service, landscaping and mulch service and executed a contract with Southwest Wholesale to mow grass at HISD schools. (Ex. 21, Tr. Day 6 PM, 52:2-12). Tejada testified that when he provided mowing services for Southwest Wholesale, checks were made payable to U.S. Southern Lawns. (Ex. 21, Tr. Day 6 PM 66:5-8).

During 2017 and 2018, Tejada testified that 80 to 90 percent of his business involved jobs with Hutchison. (Ex. 21, Tr. Day 6 PM 90:2-5). Despite this, Tejada also testified that checks made payable to him personally, were not for services rendered, and he gave most of the cash back to Hutchison. (Ex. 21, Tr. Day 6 PM 69:14-16; Tr. Day 6 PM 70:6-10; 70:22-24).

There are significant documents and testimony in the record which contradict Tejada's testimony. In her testimony (a portion of which is below), Andrea Hutchison ("Ms. Hutchison") stated that Tejada was one of the contractors who

worked on the Welch Middle School project in 2018. (Ex. 35, Tr. Day 17 PM 110:8-25).

> Q: Which subcontractors do you remember were actually working out there at Welch Middle School?...
>
> A: --- for the T-buildings over there. That's the second phase of it. That was contractors JC Castro, Ulysses [Tejada] was there, Mark McClure, Salazar, Fernando, M&H, Ulysses was there.

(Ex. 35, Tr. Day 17 PM 110:8-25).

Mark McClure verified that the Welch Middle School project was a real job, and that he in fact worked on it during 2018. When asked if the Kiddie Cushion mulch assignment was the only job he did for Hutchison, McClure responded:

> "No. I did some demo cleanup as well…
>
> Pretty much that was hauling, scraping up, cleaning up and demoing inside -- I think it was Welch. I don't remember whether it was an elementary school or junior high school.
> But inside of Welch."

(Ex. 35, Tr. Day 17 PM 37:7-16).

There are numerous checks from Southwest Wholesale to Tejada in 2018 that reference a job at Welch Middle School. (Ex. 42, GEX 710-B). The Government has not provided any evidence to the contrary. Ms. Hutchison has personal knowledge of Tejada working on the Welch Middle School project in 2018, supporting the notations on the checks included in GEX 710-B as payment(s) for work done on

Welch. Further, Hutchison's tax preparers also included payments to Tejada as expenses on their general ledger for Southwest Wholesale. (Exs. 43-44, GEX 715 and 716).

Considering the evidence in this case, Tejada's testimony that the checks he received in his individual name were not for work actually performed is simply not correct.

Preparation of the 2017 and 2018 Forms 1120

Around 2013 or 2014, George Baugh, a licensed Certified Public Accountant ("CPA") met Hutchison and later began preparing his individual and corporate income tax returns. (Ex. 45, Tr. Day 11 PM 145:14-15; 145:20-25). He prepared the Forms 1120 for Southwest Wholesale for 2017 and 2018. (Ex. 45, Tr. Day 11 PM 146:11-21). Lucille Dixon, Baugh's bookkeeper, typically prepared the general ledger and assisted Baugh in preparing returns. (Ex. 46, Tr. Day 12 AM 10:3; 10:12-13; Ex. 45, Tr. Day 11 PM 152:3-5; Ex. 46, Tr. Day 12 AM 11:21-23; 12:17-20). Dixon would request bank statements, check stubs and cancelled checks from Hutchison and/or his assistants to prepare the general ledger. (Ex. 46, Tr. Day 12 AM 13:24-25). Baugh stated that the general ledger entries for Tejada would be for work he performed and materials which "would be legitimate business expenses as far as [he] knows." (Ex. 45, Tr. Day 11 PM 160:9-16).

On cross-examination, counsel asked questions about what type of research the CPA does to determine whether a deposit is actually income. (Ex. __, Tr. Day 11 PM 183:17-20). Baugh said they use whatever is available but "we didn't, like, go into a lot of research or anything like that." (Ex. 45, Tr. Day 11 PM 184:7-8). Counsel asked specifically about one deposit in the amount of $1,125,802.66 and another deposit in the amount of $334,000. (Ex. 45, Tr. Day 11 PM 184:11-13). Baugh admitted it was possible that the $334,000 deposit was "a transfer for a loan payback to Just Construction" and if that was the case, this amount should be removed from Southwest Wholesale's total income, thus reducing its taxable income. (Ex. 45, Tr. Day 11 PM 184:11-25; 185:1-5).

Baugh thought he recalled Dixon stating that Hutchison "would call her and tell her to add more income to his taxable income." (Ex. 45, Tr. Day 11 PM 196:10-12). Close to the time the CPA firm was ready to prepare the return, Dixon might talk to Hutchison about "certain things in the general ledger." (Ex. 46, Tr. Day 12 AM 15:5-8). In preparing the general ledger, Dixon noted an expense account entitled "Materials Major", which included amounts paid to contract laborers and for materials. (*Id.* at 22:7-23). Generally, Dixon made assumptions on her own about the names of certain companies or individuals such as Arrez Landscaping, U.S. Southern Lawns and Ulysses Tejada being correctly listed as contractors in the "Materials Major" category on the general ledger. (*Id.* at 24:12-25; 25:1).

When asked if the accounting firm deducts an expense when it is not sure if something is an expense, Dixon answered "it depends on what –what the expenses are." (*Id.* at 26:24-25). For Bulldog Timber, because it had timber in the name, "it's full assumption that it's a material." (*Id.* at 27:1-2; 27:7-8). She also stated that although Hutchison gets the general ledger, they do not "point out Bulldog Timber." (*Id.* at 25:23-24). When the return is completed, Dixon said that Hutchison usually came to the office to review and sign it. (*Id.* at 28:16-17).

On at least occasion, Hutchison reviewed the tax return for Just Construction and informed Dixon the revenue was incorrect. (Ex. 46, Tr. Day 12 AM 16:8-11). He told Dixon "there's more revenue than that." (*Id.* at 16:11-13).

Over the years, Dixon watched Southwest Wholesale expand and increase the number of its employees. (*Id.* at 49:2-7). Sometimes, it was difficult to get records from the employees, and they were "a bit messy in the way that they kept records and provided them to [Dixon]." (*Id.* at 49:21-25). Dixon testified that Hutchison's business "grew quicker than he can hold on to, and he was doing the work but didn't necessarily have the employees to deal with the accounting side." (*Id.* at 61:5-7). Nevertheless, she believed that [Hutchison] "never tried to avoid paying taxes." *Id.* at AM 66:17-18).

Hutchison's records may not have been the most organized, but his long-time and trusted tax preparers never believed he was trying to be dishonest about his taxes.

<u>Bulldog Timber Payments</u>

Ayaz Mahmood is a professional poker player who met Hutchison around 2011 or 2012 at a poker game. (Ex. 14, Tr. Day 13 AM 50:6-10; 51:17-21). Prior to 2017, Mahmood played private poker games with Hutchison two or three times a week. (*Id.* at 52:21-23). Mahmood said Hutchison was not a good poker player, and he might lose a few hundred thousand dollars in one game. (*Id.* at 53:6-8; 53:11-14). In fact, Mahmood saw Hutchison lose almost $350,000 in a game. (*Id.* at 55:7-11). When he lost a poker game, Hutchison generally wrote checks to settle his debts. (Ex. 14, Tr. Day 13 AM 55:12-14). Mahmood suggested that Hutchison cash his checks with Bulldog Timber. (*Id.* at 82:23-25; 83:1).

Mahmood or one of his runners took Hutchison's checks to Bulldog Timber for cashing. (*Id.* at 58:12-15). After receiving the cash from Bulldog Timber, Mahmood would distribute the money to the winners at the next poker game to pay off Hutchison's gambling debts. (*Id.* at 57:2-6; 60:1-15). Hutchison never talked about his businesses while gambling. (*Id.* at 78:7-10). They kept the private poker games very secret because of the high stakes. (*Id.* at 63:9-13). Mahmood believed Hutchison had a gambling addiction as he gambled frequently, lost about 99 percent of the time and kept trying to win his money back. (*Id.* at 64:23-25; 67:9-15).

Mahmood asked Theilen, the owner of Bulldog Timber, to cash Southwest Wholesale checks for him, and Theilen assumed the checks were related to

gambling. (Ex. 23, Tr. Day 12 PM 115:13-14; 93:16-18). He also assumed Hutchison "was hiding gambling money from his company." (*Id.* at 115:10-11). He was asked to cash many checks from Southwest Wholesale, and he kept three percent for himself. (Ex. 23, Tr. Day 12 PM 97:6-8; 98:3-5). Theilen never talked to Hutchison on the phone, and he only met him once. (Ex. 23, Tr. Day 12 PM 105:16; 114:14-18). Due to the large amounts on the checks he cashed for Southwest Wholesale, Theilen assumed Hutchison lost a lot of money. (Ex. 23, Tr. Day 12 PM 128:8-11).

Materiality

With respect to materiality, to convict under Counts 27 and 28, the Government needed to prove that Hutchison filed a tax return that he did "not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1). A false statement on a tax return is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the [IRS]." *Neder v. United States*, 527 U.S. 1, 16, 119 S. Ct. 1827, 144 L. Ed. 2d 35 [*270] (1999) (first alteration in original) (quoting *United States v. Gaudin*, 515 U.S. 506, 509, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)).

At trial, for the 2017 tax year, there is no corroborating evidence (aside from Tejada's self-serving testimony) which demonstrates that the checks issued to Tejada were not valid business expenses. On the contrary, Ms. Hutchison and

McClure's testimony confirm that Southwest Wholesale performed a job at Welch Middle School. Importantly, Ms. Hutchison testified that she has direct knowledge of Tejada working on the Welch Middle School project. In light of Ms. Hutchison's and McClure's testimony and the documentary proof in this case, Tejada's testimony is simply not credible nor true. Accordingly, the payments to Tejada were in fact valid business expenses and should not have been included on the Special Agent's schedule of alleged false items. Therefore, the proposed adjustment of $655,210.00 to remove these payments from cost of goods sold should be rejected.

The Government also relies on one check to Bulldog Timber in the amount of $14,000.00. Dixon testified that she generally made a decision on her own accord with respect to the deduction of the payment to Bulldog Timber because of "timber" being in the name. Hutchison did not tell her how to classify or treat this payment. Further, $14,000 is just slightly more than 2% of the total proposed adjustments of $669,210 for the 2017 tax year. The total cost of goods sold reported on the 2017 Form 1120 is $4,635,282.

Also, the testimony suggests that the tax preparers might have made errors on the returns that would directly impact the income reported on the Form 1120. Importantly, the Government has not shown that the payments to Tejada are false. Under these circumstances, the remaining $14,000 amount for the Bulldog Timber

payment is unlikely to influence any decision of the IRS or juror and therefore is not a material item.

**B. The Government failed to prove that Hutchison willfully made material false statements on an income tax return, as required under 26 U.S.C. § 7206(1).**

The Government cannot prove, beyond a reasonable doubt, that Hutchison "*willfully* made and subscribed to a return…he did not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1) The evidence does not support a finding that Hutchison chose to violate a duty he knew the law imposed, at the time he signed the Southwest Wholesale returns for the 2017 and 2018 tax years. *Cheek v. United States*, 498 U.S. 192, 201–02 (1991); *United States v. Pomponio*, 429 U.S. 10, 12 (1976) per curiam; *United States v. Bishop*, 412 U.S. 346, 360 (1973).

The record shows that Hutchison's accountants gathered the necessary data such as bank statements and canceled checks to create the general ledger, and then used that general ledger to prepare the returns. The accountants coded large vendor charges into the 861 "Materials Major" account on the general ledger and matched entries labeled Bulldog Timber to the actual check numbers and amounts. The accountant's act of inputting data into their system and subsequently classifying certain payments to a particular category does not demonstrate that Hutchison knew any particular lines on the filed returns were false. When Hutchison's accountants had questions about the classification of specific items, they made adjustments. For

example, they treated unsubstantiated items as draws rather than deductions. The tax preparers made accounting judgment calls, which have nothing to do with Hutchison's intent. (*Id.* at 152:18- 25; 155:20-25; 168- 69; 170- 71; 174).

The testimony and exhibits in this case do not prove that Hutchison willfully filed false tax returns. Theilen did not testify about Hutchison's state of mind. He was a witness who merely explained his assumptions and office routines with respect to cashing checks relating to Hutchison's gambling addiction.

Mahmood testified about what happened after a poker game when Hutchison lost. He did not testify about Hutchison's books and records or his tax returns. (Ex. 14, Tr. Day 13 AM, 55:18- 20; 58:5-9; 59:21).

With respect to the payments to Tejada, the accountants coded the payments to the 861 "Materials Major" account for large subcontractor and materials expenses. (Ex. 45, Tr. Day 11 PM 159:5-8; 173:11). The Government did not call any witnesses (except for Tejada whose testimony is suspect) to testify that this work did not occur, and they did not introduce site logs or audits to show the amounts were invalid. (Ex. 42) (GEX 710-B at 1 to 12).

Under *Cheek*, willfulness means a voluntary and intentional violation of a known legal duty. The evidence in this case does not support a conviction under 26 U.S.C. § 7206(1). The Government is asking for a conviction based on questionable testimony from a contractor who admittedly received 80 to 90 percent of his work

from Hutchison and on a lack of evidence demonstrating that Hutchison voluntarily and intentionally violated a known legal duty. The law requires much more than this. *Cheek*, 498 U.S. at 201 to 02; *Pomponio*, 429 U.S. at 12; *Bishop*, 412 U.S. at 360.

At trial, for the 2018 tax year, there is no corroborating evidence (aside from Tejada's testimony) which demonstrates that the checks issued to Tejada (for projects at schools such as Welch Middle School, Forest B. Middle School, Hilliard Elementary, Robinson Elementary and Anderson Elementary as noted on the memo lines of the checks) were not valid business expenses. Therefore, the proposed adjustment of $925,316.00 to remove these payments from cost of goods sold should be rejected. The Government also relies on multiple checks to Bulldog Timber that total $604,350.00. Dixon testified that she generally made a decision on her own accord with respect to the deduction of the payments to Bulldog Timber because of "timber" being in the name. Hutchison did not tell her how to classify or treat these payments.

Further, the testimony shows that Hutchison had a gambling addition, and he used funds from the checks cashed at Bulldog Timber to pay his gambling losses. He was not trying to hide income or avoid payment of taxes. There is testimony from his tax preparers that he wanted to and did tell them to add more income to returns. Hutchison was aware of his gambling problem and use of company funds to pay his

debts so by requesting that his return preparers include more income on his returns, he thought he was getting square with the company.

The correct treatment of the Bulldog Timber payments should have been loans to shareholders, a non-taxable event. However, Schedule L, line 7 of the 2017 Form 1120 shows zero for loans to shareholders. If the Tejada and Bulldog Timber payments had been correctly characterized for what they were, legitimate business expenses and potential loans to shareholders, respectively, there would be no deficiencies in the years at issue. Under these facts, Hutchison did not willfully file corporate income tax returns for 2017 and 2018 in violation of 26 U.S.C. § 7206(1).

## V. HUTCHISON'S TRIAL COUNSEL FAILED TO PRESENT EVIDENCE THAT REASONABLE COMPETENT COUNSEL WOULD HAVE PRESENTED RESULTING IN PREJUDICE TO HUTCHISON.

Hutchison's trial counsel failed to present evidence and to call a witness that reasonable competent counsel would have presented and that resulted in prejudice to Hutchison. That prejudice, as described in more detail below, resulted in the jury convicting Hutchison on Counts 1, 14 through 24, and 28 of the indictment.

The Sixth Amendment to the United States Constitution guarantees every accused person the right to the effective assistance of counsel in a criminal proceeding. Under *Strickland v. Washington,* 466 U.S. 668 (1984), a defendant is entitled to a new trial when counsel's performance falls below an objective standard

of reasonableness and the outcome of the proceeding was prejudiced as a result. *Id.* at 687-94. Courts presume strategic competence, but even that presumption yields when counsel's choices are neither tactical nor defensible. *Id.* at 690.

The prejudice prong does not require certainty of a different result, only a reasonable probability. *Id.* at 694. "The benchmark," as the Supreme Court held, "is the fairness of the adversary process." *Id.* at 686. Hutchison's burden is not to prove certainty of acquittal, but to show that the verdict is unreliable because of counsel's errors. That burden is met here with regard to numerous counts.

### A. Hutchison's trial counsels' performance was constitutionally deficient because they failed to call Larry Nabors as a witness.

Hutchison's trial counsel should have called Larry Nabors as a witness. The significance of Larry Nabors to the determination of the facts in this case is addressed in Section III.A. *supra.* Hutchison, as already argued in Section III.A, believes that the government should have disclosed earlier to Hutchison that Nabors had materially changed his story as to what transpired between himself and Hutchison. That itself should serve as a basis to overturn the jury's verdict. However, alternatively, trial counsel erred by not calling Nabors as a witness once it learned that the government had dropped its plan to call him. By not calling Nabors themselves, Hutchison's trial counsel were unable, among other things, to establish that Nabors directly asked Hutchison and his staff and contractors to provide particular services for HISD that would then get done (Ex. 24, Tr. Day 10 PM 21:22-

22:16 (Eugene Salazar testimony)) and that Nabors and Salazar agreed to "straight billing" by Hutchison for HISD services though he did not know the details of the agreement or when it was made (Ex. 23, Tr. Day 12 PM 18:6-18 (Kendrick Solomon testimony)). Without either Nabors or Hutchison testifying, there was no one to establish (1) what the agreement was between the two as to how HISD would be billed, how the relevant contracts would be interpreted, and how HISD modified the relevant contracts through their own practices, whether for grass cutting or distribution of *Kiddie Cushion,* and (2) that Nabors, on behalf of HISD, would ask for Hutchison, his staff, and contractors to perform specific additional work for HISD and how that would be billed. Hutchison's counsel knew that Hutchison would not be testifying and, therefore, only Nabors could reasonably address these matters. All of this would have directly addressed Hutchison's reasons, and state of mind, in billing HISD in the fashion that he did and for the particular work referenced. In addition, if called, Nabors would most likely have disclosed himself that he had changed his story from what he had apparently previously told the government about his interaction with Hutchison with regard to HISD business.

The failure to call Nabors as a witness was reasonably likely to have led to a different conclusion by the jury, at least with regard to Counts 14 through 24, which all relate to Hutchison's billing practices for HISD business.

**B. Hutchison's trial counsels' performance was constitutionally deficient because they failed to use available evidence to cross-examine Ulysses Tejada to rebut his testimony that he did no work in exchange for a $175,000 check.**

Hutchisons' trial counsel possessed and should have introduced evidence that would have rebutted the testimony of Ulysses Tejada, one of his contractor's, that Hutchison caused Southwest Wholesale, LLC, to provide him with payments for services never provided causing Southwest Whole, LLC, to overstate its cost of goods sold, including cashing a $175,000 check for which Tejada claimed to have done no work. (Ex. 21, Tr. Day 6 PM 66:12-68:2 (Ulysses Tejada testimony). Tejada performed services for Southwest Wholesale. The available evidence includes a landscaping proposal from Tejada outlining the work, a handwritten invoice for work, and other bank records. (*See* Composite Exhibit 47). This evidence would have shown that Tejada performed substantial work for Southwest Wholesale and that his testimony that he did no work in exchange for receiving payments was not correct. Rather, there is documentary proof that payments to Tejada were legitimate business expenses for awarded and completed work.

Rebutting Tejada's testimony would have undermined a key part of the conspiracy alleged under Count 1 and would also remove a substantial amount of the alleged discrepancy in costs of goods underlying the tax charges in Count 28. Please refer to Section IV for a more detailed description of the allegations underlying Count 28. Without Tejada's credible testimony on this point, both counts

would reasonably have failed. And, thus, trial counsel's failure to introduce such evidence cannot be excused. And, Counts 1 and 28 should be dismissed.

### C. Hutchison's trial counsels' performance was constitutionally deficient because they failed to object to the testimony and documentary presentation of purported information from Google <u>regarding its email.</u>

Hutchisons' trial counsel should have objected to the testimony of Jason Webb and the introduction of information derived from a document purporting to be a communication from Google regarding its email servers. As discussed in detail in Section II.A., whether an electronic communication, such as email, has crossed state lines is a threshold jurisdictional question that must be satisfied to proceed with a prosecution for wire fraud under 18 U.S.C. §§ 1343 and 2. The government attempted to satisfy this unwaivable jurisdictional requirement by having a government agent, Jason Webb, testify about his purported knowledge of email servers, for which there was no foundation or personal knowledge about Google's email services and practices on behalf of the witness, and his interpretation of a purported communication from Google, which was not authenticated. Hutchison's trial counsel failed to object or otherwise address the admissibility of that evidence. If they had prevailed on an objection, which is reasonably likely, the Court would also reasonably likely have prevented all of the wire fraud charges from being presented to the jury, and given the prejudicial nature of the evidence presented regarding those charges could also reasonably likely have led to the Court's

dismissal of the entire case against Hutchison. Hutchison's trial counsel's failure to object to the Google-related evidence cannot be excused. Thus, the Court should order a new trial.

Finally, to the extent any of the arguments in this Motion are found to be unpreserved, the Court should consider Hutchison's trial counsel's failure to preserve such arguments as another basis to order a new trial.

## <u>CONCLUSION</u>

For the above reasons, this Court should enter a judgment of acquittal or order a new trial.

Respectfully submitted,

 /s/   *David Medina*
David Medina
Texas Bar No. 00000088
Federal Bar No. 2609723
Juan F. Vasquez, Jr.
Texas Bar No. 24033294
Federal Bar No. 32747
Nelson Mullins
1111 Bagby Street, Suite 2100
Houston, Texas 77002
346-646-5441
david.medina@nelsonmullins.com
juan.vasquez@nelsonmullins.com

*Counsel for Defendant*
*Anthony Hutchison*

# CERTIFICATION OF CONFERRAL

The undersigned certifies that I have conferred with AUSA Robert Johnson and AUSA Heather Winter, counsel for the Government, and the Government opposes the relief requested in this Motion.

Respectfully submitted,

/s/   *David Medina*
David Medina
Texas Bar No. 00000088
Federal Bar No. 2609723
Juan F. Vasquez, Jr.
Texas Bar No. 24033294
Federal Bar No. 32747
Nelson Mullins
1111 Bagby Street, Suite 2100
Houston, Texas 77002
346-646-5441
david.medina@nelsonmullins.com
juan.vasquez@nelsonmullins.com

*Counsel for Defendant*
*Anthony Hutchison*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 17, 2025, a true and correct copy of the foregoing was filed with the Court's electronic case filing system, thereby effectuating service on counsel for all parties.

 /s/ *David Medina*
David Medina

4903-7917-5257 088839/00001 CL6